## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

_____

|  |  |
|---|---|
| TIFFANIE TEDESCO, | ) |
|  | ) |
|  | ) |
| Plaintiff, | )   Docket No. 2:21-cv-199 |
| v. | ) |
|  | ) |
| PEARSON EDUCATION, INC., and | ) |
| XYZ INSURANCE COMPANIES, | ) |
|  | ) |
| Defendant. | ) |

_____)

## COMPLAINT

Plaintiff **Tiffanie Tedesco** brings this suit against her former employer **Pearson Education, Inc. ("Pearson")** pursuant to the Genetic Information Nondiscrimination Act, Title I of the Americans with Disabilities Act for discrimination and retaliation, the Louisiana Employment Discrimination Law, and breach of the implied covenant of good faith and fair dealing.

## I.  INTRODUCTION

1.     This case is about Tiffanie Tedesco, a top salesperson for Pearson, who suffered a devastating loss and shock when her father died of a self-inflicted gunshot wound to the heart, and was subsequently diagnosed with post-traumatic stress disorder (PTSD) and major depressive disorder.

2.     Following the tragic death of her father on December 31, 2018, Ms. Tedesco was pressured to describe the circumstances of his death to her direct supervisor, Ty Olden. Ms. Tedesco's superiors also asked her to complete a certification test shortly after the death of Ms. Tedesco's father, while Ms. Tedesco was still in shock.

3.      Ms. Tedesco gave Mr. Olden to permission to share general information that her father had died but asked that he not share the details. Contrary to Ms. Tedesco's request for privacy, Mr. Olden shared private genetic information[1] regarding the nature and circumstances surrounding the death of Ms. Tedesco's father and Ms. Tedesco's own mental health with his direct supervisor, Vice President of Sales Jeanne Bronson.

4.      Soon thereafter, various Pearson managers were informed and also shared Ms. Tedesco's private genetic information. Some Pearson managers even contacted Ms. Tedesco to interrogate her further regarding her family history, mental health status, and prescribed medications.

5.      Although Ms. Tedesco did not allow personal tragedy to affect her sales performance, Pearson managers continually questioned Ms. Tedesco's competency, ability to perform her job, and removed her from the leadership and management track.

## II.  JURISDICTION AND VENUE

6.      Ms. Tedesco brings this action in the United States District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. § 1331 (federal question), the Genetic Information Nondiscrimination Act for improperly requesting and obtaining Ms. Tedesco's private genetic information, and Title I of the Americans with Disabilities Act for discrimination and retaliation. Ms. Tedesco further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear claims arising under state law, including but not limited to the Louisiana Employment Discrimination Law (LEDL), and breach of the implied covenant of good faith and fair dealing.

---

[1] Both the federal Genetic Information Nondiscrimination Act and the Louisiana Employment Discrimination Law define "genetic information" to include information about the occurrence of a medical condition in an employee's family. 42 U.S.C. § 2000ff(4)(A)(iii); La. R.S. 23:302(8). The term "genetic information" is used in that sense herein.

7.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to Plaintiffs' claims arose in the Eastern District of Louisiana.

### III. PARTIES

*Plaintiff*

8.     **TIFFANIE TEDESCO** is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. Ms. Tedesco was an employee of Defendant Pearson Education, Inc. from March 11, 2014 until on or around August 5, 2020, when she was terminated based on her genetic information, disability and/or perceived disability, and in retaliation for Ms. Tedesco requesting a reasonable accommodation and filing an Equal Employment Opportunity Commission (EEOC) Charge of Discrimination. At all relevant times, Ms. Tedesco worked remotely within a geographic territory, which is within the Eastern District of Louisiana.

*Defendants*

9.     **DEFENDANT PEARSON EDUCATION, INC.** is a corporation domiciled in the State of Delaware and with a registered office, agent, and principal business establishment located at 3867 Plaza Tower Dr., Baton Rouge, LA 70816. Pearson is an "employer" within the meaning of the Genetic Information Nondiscrimination Act, Americans with Disabilities Act, and Louisiana Employment Discrimination Act. At all times relevant to this litigation, Pearson has employed more than (15) fifteen employees, thereby qualifying as a "covered entity" under the Genetic Information Nondiscrimination Act and under Section (2) and (5) of the Americans with Disabilities Act. 42 U.S.C. § 12111(2), (5), and employed more than twenty (20) employees as required for an "employer" under the Louisiana Employment Discrimination Law, La. R.S. 23:302(2).

10.     **DEFENDANTS XYZ INSURANCE COMPANIES** are yet unknown insurance companies, who, upon information and belief, have issued and currently have in effect one or more polices of insurance covering one or more of the Defendants named herein.

### IV. STATEMENT OF FACTS

11.     Tiffanie Tedesco incorporates by reference all other paragraphs of this Complaint as if fully set forth here.

12.     On March 11, 2014, Defendant Pearson Education, Inc. hired Ms. Tedesco as a Sales Representative in the Higher Education Division. At all relevant, Ms. Tedesco worked remotely within her geographic territory in the Eastern District of Louisiana.

13.     Ms. Tedesco was hired by and initially reported directly to District Manager Julie Morel. Ms. Morel reported to Regional Manager Kevin Temple and General Manager Bill Schoof.

14.     Following a company reorganization, Jeanne Bronson was promoted to Vice President of Sales in June 2018.

15.     Due to the 2018 Pearson company reorganization, Ms. Tedesco was placed in Ms. Bronson's line of reporting. After the reorganization, Ms. Tedesco reported to District Manager Ty Olden, who reported to Ms. Bronson.

16.     Ms. Tedesco was one of Pearson's top sales employees.

17.     Pearson management considered Ms. Tedesco a leader and placed her in a training path for leadership and management roles.

18.     Ms. Tedesco's advice was trusted and sought after, and her opinions were highly regarded.

19.     Ms. Tedesco was awarded Sales Representative of The Year for North America in 2015 & 2018 for having the highest cumulative sales.

20.     Ms. Tedesco was awarded President's Club (Leadership Council) in 2017 and 2018, an award that she received for being in the top 1% of sales personnel for North America.

21.     In 2017, Pearson District Manager Julie Morel nominated Ms. Tedesco for Pearson's Developing Leaders program. Ms. Tedesco's colleagues, including Kim Bishop, wrote letters in support of Ms. Tedesco. Ultimately, Pearson's executive board selected Ms. Tedesco for the program.

22.     Admission to Pearson's Developing Leaders program is highly coveted as it exists to transition employees into upper-management level roles.

23.     Ms. Tedesco won the Pearson Award in 2018, for the highest cumulative sales over three years, after winning Pearson millions of dollars of business because of her rapport with and hard work for one of Pearson's client's, Southeastern Louisiana University.

24.     On December 31, 2018, Ms. Tedesco's father, with whom she shared a close relationship, left a note addressed to his family, including Ms. Tedesco, and died of a self-inflicted gunshot wound to the heart.

25.     Ms. Tedesco was distraught due to the unexpected and violent nature of her father's death.

26.     On January 1, 2019, Ms. Tedesco, in shock, told her direct superior, Ty Olden, that her father had died. Mr. Olden asked Ms. Tedesco to stay in touch regarding the burial.

27.     On or around January 14, 2019, Mr. Olden asked Ms. Tedesco to take a certification test, which was an intensive internal test covering a wide range of higher education subjects and disciplines relevant to Pearson's product catalog.

28.     Because Mr. Olden expected Ms. Tedesco to perform at her usual high-achieving level, Ms. Tedesco felt pressured to specify to Mr. Olden that her father died from a violent suicide and she, therefore, feared she could not perform on the test as expected.

29.     To be relieved of responsibility for taking the certification test, Mr. Olden told Ms. Tedesco he would need to tell his direct supervisor, Jeanne Bronson, Pearson's Vice-President of Sales.

30.     Ms. Tedesco told Mr. Olden "I understand if you need to tell to Jeanne" because he was making an exception for Ms. Tedesco to take the test, but clarified that the details were "my story to tell."

31.     Mr. Olden only had Ms. Tedesco's permission to information with Ms. Bronson to the extent necessary to exempt Ms. Tedesco from the certification test.

32.     Mr. Olden gratuitously shared Ms. Tedesco's private genetic information regarding Ms. Tedesco's family history of suicide and Ms. Tedesco's genetic predisposition to mental health issues with Jeanne Bronson.

33.     In January of 2019, Ms. Tedesco began medical treatment for the mental trauma related to her father's unexpected and violent death.  Ultimately, Ms. Tedesco was diagnosed with Major Depressive Disorder, Post-Traumatic Stress Disorder, and Passive Suicidal Ideation.

34.     In mid-March of 2019, Ms. Tedesco learned that her great-grandmother also died by suicide and that her great-grandmother was diagnosed as "manic."

35.     Ms. Tedesco did not tell or give anyone permission to tell Pearson Managing Director Robin Baliszewski about her family history of suicide.

36.     Ms. Bronson shared Ms. Tedesco's private genetic information regarding Ms. Tedesco's family history of suicide and Ms. Tedesco's predisposition to mental health issues with Ms. Baliszewski.

37.     Ms. Bronson did not have Ms. Tedesco's consent to share genetic information with Ms. Baliszewski.

38.     Ms. Bronson instructed Ms. Baliszewski to question Ms. Tedesco on this topic and obtain more information from Ms. Tedesco.

39.     On March 18, 2019, Ms. Baliszewski called Ms. Tedesco to give condolences. Ms. Baliszewski began the conversation by saying "my condolences about your father." Ms. Baliszewski shared intimate details of her own life involving a suicide and thereby prompted Ms. Tedesco to open up and acquired additional details regarding Ms. Tedesco's private genetic information and mental health.

40.     On April 3, 2019, Jeanne Bronson suggested Ms. Tedesco update her resume because layoffs were coming.

41.     Ms. Tedesco was unable to sleep that night because she feared she would lose her job.

42.     On April 4, 2019, Ms. Tedesco had breakfast with a client while at Another Broken Egg Café. When Ms. Bronson arrived at the restaurant after the meal, she became agitated with Ms. Tedesco.

43.     Ms. Bronson raised her voice at Ms. Tedesco and said "You're acting manic! You need to get some help. I've never dealt with suicide before."

44.     On the way to airport later that day, Ms. Tedesco asked Ms. Bronson for professional constructive feedback. Ms. Bronson rudely responded, "you need to get some help."

45.     During the ride to the airport, Ms. Bronson admitted to Ms. Tedesco that she shared Ms. Tedesco's family history of suicide, including the details of Ms. Tedesco father's suicide, with Ms. Baliszewski and that she asked Ms. Baliszewski to call Ms. Tedesco and question her regarding her mental health status.

46.     Ms. Bronson also shared Ms. Tedesco's private genetic information regarding Ms. Tedesco's family history of suicide and Ms. Tedesco's predisposition to mental health issues with another manager, Julie Morel, who was not in Ms. Tedesco's line of reporting.

47.     Ms. Bronson did not have Ms. Tedesco's consent to share genetic information with Ms. Morel.

48.     Although Ms. Morel and Ms. Tedesco were close and Ms. Morel already knew some details of Ms. Tedesco's personal life, Ms. Morel called Ms. Tedesco and further asked her about what medication she was taking.

49.     When Ms. Tedesco told Ms. Morel about the incident with Ms. Bronson, Ms. Morel replied "well it is manic behavior to cry."

50.     Ms. Morel suggested Ms. Tedesco take FMLA leave.

51.     On April 7, 2019, Ms. Tedesco filed for FMLA leave effective immediately due to Pearson management treating her with severe hostility and harassing her due to her mental condition.

52.     Later in the day on April 7, 2019 Ms. Baliszewski instructed Ms. Tedesco to contact Kelly Rippolone, Pearson's Vice-President of Human Resources, regarding the incident with Ms. Bronson.

53.     On April 8, 2019, at Ms. Baliszewski's request, Ms. Tedesco reported the incident involving Ms. Bronson to Ms. Rippolone.

54.     Around the same on April 8, 2019, Ms. Bronson had a conference call with sales representatives Samantha McKay, Ashton Hurst, and District Manager Ty Olden to apologize for her behavior and said she could not sleep all night because she felt she was the reason Ms. Tedesco took FMLA leave.

55.     On April 10, 2019, Ms. Tedesco contacted Ms. Rippolone regarding Pearson's grievance policy or code of conduct. Ms. Rippolone was unhelpful, and her replies were not responsive to Ms. Tedesco's requests.

56.     While on FMLA leave, Pearson misclassified Ms. Tedesco as unemployed.

57.     In May 2019, Ms. Tedesco began the process of attempting to purchase a home as a first-time buyer. While in discussions with her lender, Ms. Tedesco learned that Pearson had misclassified her as having been unemployed since 2017.

58.     Pearson had also incorrectly reported Ms. Tedesco's salary as a significantly lower amount.

59.     When Ms. Tedesco contacted Pearson, they refused to fix it.

60.     Because Pearson misclassified Ms. Tedesco as unemployed, Ms. Tedesco's lender would not approve any loans.

61.     Also, in May 2019, while still on FMLA leave, Pearson's misclassification of Ms. Tedesco employment status affected Ms. Tedesco's dental coverage and resulted in her receiving dental bills.

62.     Ms. Tedesco was harassed by creditors regarding the dental bills, which she was forced to dispute for the rest of the year.

63.     In June 2019, Pearson underwent another company organization.

64.    On July 1, 2019, Ms. Tedesco's tenure as Pearson's "Evidence Field Champion" was renewed for another 18 months beginning in August 2019 and ending January 2021.

65.    Ms. Tedesco was recognized as the Evidence Field Champion because of her exemplary sales performance and leadership skills.

66.    Evidence Field Champion is a Pearson Peer Leadership Role is a prestigious and highly competitive title reserved for high-achieving sales representatives, whom Pearson is training for leadership roles within the company. Pearson provides Evidence Field Champions with leadership training and those selected are considered on the path for promotion to upper-management roles.

67.    Only July 15, 2019, Ms. Tedesco returned from her first leave.

68.    Upon returning from leave, Ms. Tedesco found her superiors, including Ty Olden, Kim Bishop, Lara Davis, Robin Baliszewski, and others, treated her as if she were untrustworthy and incompetent to perform her job, and demoted her from the leadership and management track.

69.    For example, after she returned from leave, Southeastern Louisiana University contacted Ms. Tedesco about Mr. Olden's failure to address an issue they were having with dual enrollment of high school students. When Ms. Tedesco attempted to report the issues to Mr. Olden, Mr. Olden screamed at her "Are you calling about Southeastern? I don't want to fucking hear it!"

70.    Not only was this pattern of behavior from Pearson management discriminatory, but it was unjustified and undeserved as Ms. Tedesco remained a top salesperson for Pearson.

71.    The discriminatory and harassing treatment of Ms. Tedesco by Pearson management exacerbated Ms. Tedesco's Major Depressive Disorder, Post-Traumatic Stress Disorder, and Passive Suicidal Ideation.

72.     On September 13, 2019, Ms. Tedesco received an email from her district manager, Ty Olden, telling her to "put the computer down tomorrow and go sit in your garden," questioning her "bandwidth," and thereby suggesting Ms. Tedesco was not capable of working and referencing a garden Ms. Tedesco had dedicated to her deceased father.

73.     On September 14, 2019, Ms. Tedesco filed a complaint with Pearson via www.pearsonethics.com (a website set up by Pearson for receiving complaints) regarding Ms. Bronson's hostility towards her.

74.     According to informational materials Pearson provided its employees, Pearson Ethics.com is operated by an independent company, is available 24 hours a day, 7 days a week. Further, per Pearson policy, "…all Pearson Employees may choose to make a report anonymously on our site … All Concerns submitted through www.pearsonethics.com will be treated CONFIDENTIALLY, whether raised anonymously or otherwise."

75.     Per a letter from CEO John Fallon in Pearson's Code of Conduct, "[i]f for any reason you feel that we're not doing that, I very much encourage you to speak up to your manager, HR, or directly to me. You can also report concerns anonymously at www.pearsonethics.com. Anyone raising a question should and can do so without retaliation or consequence. We need to speak up when we suspect violations of the law, regulations, Code, or  our policies."

76.     From September through November 2019, Ms. Tedesco reported several incidents of harassment, retaliation, hostile work environment to Pearson's Director of Employee Relations Roger Grunwald and attempted to receive reasonable accommodation.

77.     The accommodations she requested were (1) to not be forced to take leave; and (2) to be placed in a line of reporting wherein she could work free from the ongoing hostility, harassment, and questioning regarding her mental condition and competency.

78.     On September 25, 2019, Mr. Grunwald, told Ms. Tedesco that he spoke with Ms. Baliszewski regarding Ms. Tedesco's requested accommodations and options, and that Ms. Baliszewski thought Ms. Tedesco should go back on leave.

79.     Mr. Grunwald acknowledged Ms. Tedesco's request that she not be forced to take leave.

80.     Ms. Tedesco's superiors criticized and harassed her for working while on FMLA leave, and openly stated that she needed to take leave again.

81.     But Ms. Tedesco did not want to take leave.

82.     On September 28, 2019, Ms. Rippolone called Ms. Tedesco and asked if Ms. Tedesco was suicidal. Ms. Tedesco told Ms. Rippolone she was not and reiterated that she did not want to go on leave as she enjoyed work and wanted to continue working.

83.     Ms. Tedesco requested a reasonable accommodation, namely that she be placed in a different position with Pearson due to the hostility she was experiencing in her current placement under Ty Olden.

84.     Ms. Rippolone rejected Ms. Tedesco's request and did not suggest any alternatives.

85.     Instead, Ms. Rippolone continued interrogating Ms. Tedesco about whether Ms. Tedesco would self-harm. Ms. Tedesco again responded that she would not and again asked for an accommodation that would allow her to continue to work free from harassment regarding her mental condition.

86.     Although Ms. Rippolone ended the phone call by telling Ms. Tedesco she would speak to Ms. Baliszewski, Ms. Rippolone never mentioned any alternatives other than forcing Ms. Tedesco to take leave or use her vacation.

87.     Immediately after the phone call with Ms. Rippolone, Ms. Tedesco submitted a request to take vacation as directed by Ms. Rippolone.

88.     On September 30, 2019, Ms. Baliszewski and Ms. Tedesco had a conference call wherein Ms. Baliszewski, despite knowing Ms. Tedesco desire to continue working for Pearson, told Ms. Tedesco that she had Ms. Baliszewski's full support to quit her job with Pearson.

89.     Ms. Baliszewski did not provide Ms. Tedesco with any option other than quitting.

90.     On October 1, 2019, Ms. Tedesco took vacation to avoid being forced to take leave again.

91.     On October 18, 2019, Ms. Tedesco had no choice but to file a claim for Short-Term Disability as she could no longer work without an accommodation.

92.     Ms. Tedesco's Short-Term Disability benefits began on November 4, 2019.

93.     On November 20, 2019, Ms. Tedesco emailed Mr. Grunwald regarding the status of her complaint against Ms. Bronson for violation of Pearson's code of conduct. Mr. Grunwald responded the next day by telling Ms. Tedesco she should not be working while on leave, echoing the criticism previously leveled at Ms. Tedesco during her FMLA leave and suggesting her mental condition was questionable.

94.     On December 16, 2019, Dr. Suzanne C. Klenck, Ms. Tedesco's treating clinical psychologist, noted that "[a] hostile and demanding work environment leaves [Ms. Tedesco] feeling vulnerable, distrustful, and triggers the fight/flight response."

95.     On January 18, 2020, Pearson manager Bill Schoof sent an email out that stated Ms. Tedesco's tenure as Evidence Field Champion ended on December 31, 2019, a year earlier than promised, and named Ms. Tedesco's replacement as Evidence Field Champion.

96.     After retaining an attorney, Ms. Tedesco filed an EEOC Charge of Discrimination on April 23, 2020, on the grounds that Pearson discriminated and retaliated against her due to her genetic information and disability.

97.     From October 18, 2019 to present, Pearson has thwarted Ms. Tedesco's efforts to access her disability, vacation, health and other benefits.

98.     On May 5, 2020, Ms. Tedesco was approved for Long-Term Disability through April 27, 2022.

99.     On June 2, 2020, Ms. Tedesco participated in the EEOC's mediation process with Ms. Rippolone and Daniel Lennon, Pearson's Vice-President Senior Counsel.

100.    The mediation was unsuccessful, and the case was transferred to the EEOC's investigative division.

101.    On July 23, 2020, while the EEOC investigation was ongoing, Ms. Rippolone sent Ms. Tedesco an email requesting additional medical information regarding Ms. Tedesco's ability to perform essential work functions and Ms. Tedesco's return date.

102.    Additionally, in this email, Ms. Rippolone vaguely referred to Pearson's "interactive process."

103.    Although Ms. Tedesco had retained attorneys and the EEOC investigation was ongoing, Ms. Rippolone sent this email exclusively to Ms. Tedesco – and did not include Ms. Tedesco's attorneys on the communication.

104.    On July 28, 2020, Ms. Tedesco responded to Pearson management explaining how her requests for accommodation from September through November 2019 were ignored and there was no "interactive process."

105.    On July 31, 2020, Ms. Tedesco's health insurance was nearly cancelled due to Ms. Rippolone.

106.    Ms. Rippolone incorrectly told Mercer, the healthcare broker, that there was an amount owed on Ms. Tedesco's accounts.

107.    Although Ms. Tedesco submitted evidence of payment, Ms. Rippolone continued to respond that Ms. Tedesco owed money.

108.    During this time period, Ms. Tedesco received multiple account delinquency letters, which caused her great distress as it suggested she would lose her health insurance.

109.    Also, on July 31, 2020, Dr. Klenck sent a letter to Ms. Rippolone in response to Ms. Rippolone's request regarding Ms. Tedesco's work status. Dr. Klenck reported that Ms. Tedesco was disabled at that time and that returning to a hostile work environment would negatively affect Ms. Tedesco's recovery.

110.    On August 5, 2020, while Ms. Tedesco was on disability leave and the day before Ms. Tedesco's rebuttal to Pearson's position statement for her EEOC claim was due, Pearson terminated Ms. Tedesco's employment via email and letter from their attorneys.

111.    According to the email from Pearson's attorneys, "[Pearson] has no choice but to terminate Ms. Tedesco's employment as it cannot hold her position open indefinitely. Since her psychologist has requested that it not communicate with her, we are forwarding the termination letter to your attention."

112.    At the time Pearson sent this termination letter, they were conducting lay-offs because school enrollment rates dropped and business slowed down during the Covid-19 pandemic – they were not in the process of filling positions.

113.     Further, per Pearson policy and practice, Pearson employees are not laid off while on Long-Term Disability. Although Pearson does not have to keep an employee's particular position open, they will typically have some position available within their global company to offer an employee upon their return to work.

114.     Oddly, Ms. Tedesco has received contradictory communications regarding whether she was actually terminated.

115.     On one hand, the email was clear that it was a "termination letter."

116.     But according to Pearson's benefit providers, Ms. Tedesco is classified as on "active leave," which prevents Ms. Tedesco from accessing her 401k benefits, forces her to remain on Pearson's health insurance plan, and makes it unclear whether she still has life insurance.

117.     On August 14, 2020, Dr. Klenck sent Ms. Rippolone a letter clarifying that Ms. Tedesco did not receive help and support from Ms. Rippolone. When Ms. Tedesco had previously reached out to Ms. Rippolone, Ms. Rippolone had interrogated Ms. Tedesco about whether she was suicidal or would otherwise self-harm and ignored Ms. Tedesco's requests for reasonable accommodation. Further, Ms. Rippolone incorrectly reported Ms. Tedesco's employment information to lenders and insurance companies. Ms. Rippolone did this repeatedly, causing Ms. Tedesco great distress. Thus, Dr. Klenck was concerned direct contact with Ms. Rippolone specifically would negatively impact Ms. Tedesco's mental health as it had in the past.

118.     On August 28, 2020, Ms. Tedesco filed a separate Charge of Discrimination with the EEOC on the grounds that Pearson violated the ADA and GINA when they harassed, discriminated against, *and terminated* her in retaliation for her disclosure of genetic information, requests for accommodation, and for her filing of the original EEOC Charge. Additionally, Ms. Tedesco's

EEOC Charge noted Pearson's ongoing actions which prevented her from accessing certain benefits.

119.    On September 2, 2020, Ms. Tedesco received a letter from Empower Retirement, the provider for Pearson's retirement plan. According to this letter, Ms. Tedesco cannot access her 401(k), "[t]he Plan does not list you as terminated but rather being on long term leave starting May 12, 2020, which makes you ineligible for a distribution or a loan."

120.    On November 3, 2020, the EEOC issued Ms. Tedesco a Notice of Right to Sue. She timely files this Complaint within ninety days of the receipt thereof.

## V.      CAUSES OF ACTION

### *First Cause of Action*
### Violation of Rights Under the Genetic Information Nondiscrimination Act

121.    Plaintiff realleges and incorporates each and every foregoing paragraph.

122.    Genetic information under GINA includes information about "the manifestation of a disease or disorder in family members[.]" 42 U.S.C. § 2000ff(4)(A)(iii).

123.    GINA requires that if an employer "possesses genetic information about an employee or member, such information shall be maintained on separate forms and in separate medical files and be treated as a confidential medical record of the employee or member." 42 U.S.C. § 2000ff–5(a).

124.    GINA further forbids the disclosure of genetic information except under the limited circumstances set out in 42 U.S.C. § 2000ff–5(b).

125.    Suicide and suicidal behavior are highly familial, and appears to be familially transmitted.[2] Adoption, twin, and family studies support the view that the etiology of the familial

---

[2] See David A. Brent and Nadine Melhem, *Familial transmission of suicidal behavior*, THE PSYCHIATRIC CLINICS OF NORTH AMERICA vol. 31,2 (2008): 157-77. doi:10.1016/j.psc.2008.02.001, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2440417/.

transmission of suicidal behavior is at least in part genetic.[3] One study found that people who had a mother, father, or sibling die from suicide were *two and a half times* more likely to commit suicide themselves compared with those without a similar family history.[4]

126.    Information about the manifestation of mental health issues and suicide in Tiffanie Tedesco's family members is protected genetic information under GINA.

127.    Under GINA, it is unlawful for an employer to deliberately "request, require, or purchase genetic information with respect to an employee or a family member of the employee[.]" 42 U.S.C. § 2000ff-1(b).

128.    Multiple Pearson managers and directors unlawfully and deliberately requested information regarding the manifestation of mental health issues and suicide in Ms. Tedesco's family members, and shared this information with amongst themselves, all without Ms. Tedesco's "prior, knowing, voluntary, and written authorization." *See* 42 U.S.C. § 2000ff-1(b)(2)(B); 42 U.S. Code § 2000ff–5.

129.    Pearson violated GINA anti-disclosure rules when Ms. Tedesco's genetic information was shared with employees (including Ms. Baliszewski and Ms. Morel) without her consent.

130.    An employer who fires an employee or discriminates against the employee in compensation, or terms or privileges of employment based on genetic information of the employee or the employee's family violates GINA. 42 U.S.C. § 2000ff-1(a)(1).

---

[3] *Id.*
[4] See Suicide Risk Linked to Family History, WEBMD (Oct. 12, 2002), https://www.webmd.com/mental-health/news/20021010/suicide-risk-linked-to-family-history (emphasis added).

131.    After Pearson management improperly acquired Ms. Tedesco's genetic information, they discriminated against Ms. Tedesco by forcing her to take FMLA leave, which interfered with the terms or privileges of her employment as a salesperson.

132.    Pearson further violated Ms. Tedesco's employment rights under GINA when they terminated her while she was actively in treatment for her disabling mental health issues.

*Second Cause of Action*
**Violation of Rights Under the Americans with Disabilities Act**

133.    Plaintiff realleges and incorporates each and every foregoing paragraph.

134.    A disability under the ADA is "an impairment that substantially limits one or more major life activities, a record of such an impairment, or being regarded as having a disability." 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g).

135.    On November 4, 2019, Ms. Tedesco qualified for and began receiving Short-Term Disability benefits. Ms. Tedesco's treating clinical psychologist had diagnosed her with PTSD and Major Depressive Disorder, and Passive Suicidal Ideation, exacerbated by Pearson's demanding and hostile work environment.

136.    Because of her mental health impairment, on May 5, 2020, Ms. Tedesco was approved for long-term disability through April 27, 2022.

137.    Ms. Tedesco's psychological impairments resulting from her trauma following the violent suicide of her father reduced her ability to return to work as she qualified for long-term disability through April 27, 2022. Thus, she qualifies as a person with a disability under the ADA.

138.    Alternatively, Ms. Tedesco meets the definition of disability under the ADA by the fact that Pearson had a record of Ms. Tedesco's disability. 42 U.S.C. § 12102(1)(B). Ms. Tedesco applied for disability benefits and submitted letters from her treating clinical psychologist, Dr. Klenck, stating her diagnosis, symptoms, and recommended occupation accommodations.

139.   Also, Ms. Tedesco meets the definition of disability under the ADA by the fact that Pearson regarded Ms. Tedesco as having a disability. 42 U.S.C. § 12102(1)(C). Pearson in their own assessment of Ms. Tedesco forced Ms. Tedesco to take FMLA leave, vacation, and to apply for disability.

140.   Ms. Tedesco was qualified for an employment position with Pearson under 42 U.S.C. § 12111(8) because Ms. Tedesco was able to perform the essential functions of her job as a salesperson with the reasonable accommodation of a job restructuring, such as placing her within a different line of reporting or limiting contact with managers who were hostile towards Ms. Tedesco.

141.    Further, as suggested in the email from Pearson's attorneys, a continued leave of absence through the end-date of her long-term disability leave would have been a reasonable accommodation. Due to the Covid-19 pandemic, enrollment in schools was down and Pearson's business was slow – there was no need to fill Ms. Tedesco's position. On the contrary, Pearson was in the process of lay-offs – not in the process of filling positions.

142.   An employee with a disability is entitled to reasonable accommodations that do not constitute an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9.

143.   An employer is obligated to engage in an interactive process with the employee that identifies the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(o)(3). This interactive process is mandatory. *Stokes v. Nielsen*, 751 Fed.Appx. 451, 455 (5th Cir. Oct. 8, 2018).

144.   Ms. Tedesco requested a reasonable accommodation from Pearson, and her requests for accommodation were declined.

145.   The accommodations she sought were not an undue burden on Defendants.

146.     Further, Pearson failed to engage Ms. Tedesco in the interactive process of seeking accommodation. Their response to every request for an accommodation was to suggest Ms. Tedesco take leave and stop working. Pearson should have engaged in a back-and-forth dialogue to determine the precise limitations and consider any other available accommodations. When Ms. Tedesco went on leave as Pearson demanded, Pearson employed a manger who was repeatedly hostile and unhelpful towards Ms. Tedesco to engage with her. When Ms. Tedesco's treating clinical psychologist, Dr. Klenck sent a letter regarding how harmful Ms. Rippolone's involvement was to Ms. Tedesco's recovery, Pearson terminated Ms. Tedesco's employment.

147.     When Pearson refused to accommodate Ms. Tedesco's disability, they violated her employment rights under the ADA. They further violated her rights under the ADA when they failed to engage in the interactive process.

148.     Pearson further violated Ms. Tedesco's rights under the ADA when they reported her to third parties as being "suspended," rather than on leave.

### Third Cause of Action
### Unlawful Retaliation Under the Americans With Disabilities Act

149.     Plaintiff realleges and incorporates each and every foregoing paragraph.

150.     A request for a reasonable accommodation of a disability is a protected activity under the Americans With Disabilities Act. *Jenkins v. Cleco Power, LLC*, 487 F. 3d 309, 316-17 (5th Cir. 2007). Retaliation for such requests is unlawful under 42 U.S.C. § 12203(a).

151.     Ms. Tedesco engaged in a protected activity when, for months, she requested a reasonable accommodation due to her mental health impairments. Ms. Tedesco suffered an adverse employment action by being terminated as a result of this request.

152.     Specifically, Ms. Tedesco requested a reasonable accommodation that would allow her to continue working – a job restructuring that would remove her from Ms. Bronson's line of

reporting. Ms. Rippolone and other Pearson managers denied Ms. Tedesco's request and refused to suggest any alternatives.

153.    When Ms. Tedesco finally relented to Pearson's demand that she take leave and went out on long-term disability, Ms. Rippolone, who had been hostile towards Ms. Tedesco continued to contact Ms. Tedesco. Even after Ms. Tedesco retained lawyers and participated in mediation, Ms. Rippolone still contacted Ms. Tedesco directly to harass Ms. Tedesco and demanded to know when she would return to work.

154.    When Pearson forced Ms. Tedesco to take leave in response to her request for an accommodation and terminated her when she did so, they unlawfully retaliated under the Americans with Disabilities Act.

### *Fourth Cause of Action*
### Violation of Louisiana Employment Discrimination Law (La. R.S. 23:301, *et seq.*)

155.    Plaintiff realleges and incorporates each and every foregoing paragraph.

156.    Ms. Tedesco's psychological impairments satisfies the disability requirement under La. R.S. 23:322(3).

157.    Ms. Tedesco is otherwise qualified under La. R.S. 23:322(8) because she can perform the essential functions of the salesperson position or other position within Pearson Education, Inc. with a reasonable accommodation.

158.    No employer may fail or refuse to reasonably accommodate an otherwise qualified person with a disability on the basis of a disability, when it is unrelated to the individual's ability, with reasonable accommodation, to perform the duties of a particular job or position. La. R.S. 23:323(B)(1).

159.    No employer may discharge or otherwise discriminate against an otherwise qualified person with a disability with respect to compensation or the terms, conditions, or

privileges of employment on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position. La. R.S. 23:323(B)(2).

160.    When Pearson terminated Ms. Tedesco in response to her request for an accommodation, they unlawfully retaliated under Louisiana Employment Discrimination Law.

161.    Further, information about the manifestation of mental health issues and suicide in Tiffanie Tedesco's family members is protected genetic information under Louisiana Employment Discrimination Law.  La. R.S. 23:302 (8).

162.    Pearson violated Louisiana Employment Discrimination law when its managers and directors deliberately requested information regarding the manifestation of mental health issues and suicide in Ms. Tedesco's family members, and shared this information with amongst themselves. La. R.S. 23:368(B)(3).

163.    Pearson unlawfully discriminated against Ms. Tedesco with respect to compensation, terms or privileges of her employment as a salesperson, and ultimately terminated her because of her protected genetic information, and while Ms. Tedesco was actively in treatment for mental health issues related to her protected genetic information. La. R.S. 23:368(B)(1).

### *Fifth Cause of Action*
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Louisiana Contract Law)

164.    Plaintiff realleges and incorporates each and every foregoing paragraph.

165.    There is an implied covenant of good faith and fair dealing in every contract in Louisiana. *See Bonanza International, Inc. v. Restaurant Management Consultants, Inc*., 625 F. Supp. 1431, 1445 (E.D.La. 1986); *Grisaffi v. Dillard Dep't Stores, Inc.,* 43 F.3d 982, 983 (5th Cir.1995); *Brill v. Catfish Shaks of America, Inc.,* 727 F.Supp. 1035, 1039 (E.D.La.1989).

166.     Pearson failed to engage in good faith and fair dealing in regard to Ms. Tedesco's employment contract by forcing her to take leave and stop working, and then terminating her while she was disability leave.

167.     This termination occurred with the intent to unfairly deprive Ms. Tedesco of compensation and entitlement to reinstatement despite Ms. Tedesco's willingness and ability to continue working.

168.     When Pearson terminated Ms. Tedesco's employment in bad faith, they violated the implied covenant of good faith and fair dealing under Louisiana law.

### **RELIEF REQUESTED**

169.     Wherefore TIFFANIE TEDESCO prays for judgment against Defendant as follows:

    a.   For a judgment against Defendants for all asserted causes of action;

    b.   For a judgment awarding compensatory damages;

    c.   For a judgment awarding special damages;

    d.   For a judgment awarding TIFFANIE TEDESCO her costs and attorney's fees;

    e.   For a judgment awarding pre- and post-judgment interest at the highest rates allowed by law; and

    f.   For all other and further relief as may be necessary and appropriate.

170.     Plaintiff states any and all other causes of action that may become known through a trial of this matter on its merits against any and all other parties which are herein named or which may be added later, and requests any and all other damages or remedies which this Court may deem equitable.

171.     Plaintiff reserves the right to notice of defect to this pleading and reserves the right

to amend or supplement this Petition after discovery of any additional fact, law, or claim, the amendment of which to be performed by the filing of any subsequent pleading.

Respectfully submitted,

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully Submitted:

**LAW OFFICE OF WILLIAM MOST**

*/s/ Hope A. Phelps*
**HOPE PHELPS (La. Bar No. 37259)**
**WILLIAM MOST (La. Bar No. 36914)**
**DAVID LANSER (La. Bar No. 37764)**
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Tel: 504.256.4615
Email: hopeaphelps@outlook.com

*Counsel for Plaintiff, TIFFANIE TEDESCO*