**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| TIFFANIE TEDESCO,<br><br>        Plaintiff,<br>v.<br><br>PEARSON EDUCATION, INC., and<br>XYZ INSURANCE COMPANIES,<br><br>        Defendants. | Docket No. 2:21-cv-199<br><br>JUDGE: LANCE M. AFRICK<br><br>MAGISTRATE: DONNA<br>PHILLIPS CURRAULT |

**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

### I. INTRODUCTION

Ms. Tedesco filed this lawsuit because Defendant, Pearson Education, Inc., unlawfully obtained and disclosed Ms. Tedesco's family history of mental health issues and suicide, forced Ms. Tedesco to take leave, and then fired Ms. Tedesco after she filed a charge of discrimination.

Defendant now moves to dismiss Ms. Tedesco's lawsuit. R. Doc. 12-1. But the motion relies on several incorrect premises. For example, the motion relies on the assumption that "genetic information" only means the "results of genetic testing," when in fact the statute defines the term broadly to include family medical history information. The motion also relies on the assumption that Ms. Tedesco had no written employment contract, when in fact she had a contract that identified a fixed period of employment – which Pearson called "tenure" – in a particular role. For these and other reasons described herein, Plaintiff asks that Defendant's motion be denied.

### II. FACTUAL BACKGROUND

Defendant Pearson Education, Inc. is a large corporation that supplies educational resources and tools around the world. It has more than 20,000 employees that deliver products and

services in nearly 200 countries.[1] Plaintiff Tiffanie Tedesco was a top sales employee for Defendant, with the highest cumulative sales in North America, and was on track for a leadership role in the company. Complaint, ¶¶ 16-23. Due to her exemplary sales performance, Defendant offered Ms. Tedesco a highly coveted "tenure" in a company leadership training program known as the "Evidence Field Champion." Complaint, ¶ 64-66. Ms. Tedesco accepted the position. *Id.* Ms. Tedesco's tenure in this program was set to last 18 months beginning in August 2019 and ending January 2021. Complaint, ¶ 64.

After the violent suicide of Ms. Tedesco's father, Defendant pushed Ms. Tedesco to apply for FMLA leave and disability. Complaint, ¶¶ 50-54, 131, and 139. Ms. Tedesco took the 12 weeks of leave as allowed under the FMLA. Complaint, ¶¶ 51 and 67. On July 15, 2019, Ms. Tedesco returned from her first leave. Complaint, ¶ 67. While on leave, Defendant removed Ms. Tedesco from a valuable account, which she had worked to grow, and then rejected any and all input from her on the account when she returned – even though the client explicitly requested Ms. Tedesco's input. Complaint, ¶¶ 23, 69.

When Ms. Tedesco returned from leave, she discovered an employee of Defendant in her line of reporting shared her family medical history with other people without authorization. Complaint at ¶¶ 35-47 (describing that Ms. Bronson shared Ms. Tedesco's family medical history with R.B. and Ms. Morel). In response to Ms. Tedesco report of this violation and request for an accomodation, Defendant pressured Ms. Tedesco to go back on leave against her wishes, and gave her no other option and no accommodation. Complaint, ¶¶ 76-91. The only "accommodations" Defendant offered Ms. Tedesco were to take leave, use her vacation time, or quit. Complaint, ¶¶ 86-88. Ms. Tedesco requested that she be placed in a different line of reporting or position to alleviate the stress of reporting to someone who disclosed her private medical history and harassed

---

[1] Pearson, "Our Company," available online at https://plc.pearson.com/company/.

her regarding her mental health status. Complaint, ¶¶ 77, 83, 140, and 152. Defendant ignored this request, failed to engage in an interactive process by suggesting any alternative, and instead continued pressuring Ms. Tedesco to take leave again, use her vacation time, or quit. Complaint, ¶¶ 86-88. When Ms. Tedesco requested the accommodation, Defendant questioned her about her mental health status and whether she was a suicide risk. Complaint, ¶¶ 82 and 85. Ms. Tedesco's treating clinical psychologist, Dr. Suzanne C. Klenck, submitted medical documentation evidencing that this hostility was harmful to Ms. Tedesco's recovery. Complaint, ¶ 94.

After Ms. Tedesco was forced to take Short-Term Disability Leave, Defendant retaliated against her by terminating her tenure as Evidence Field Champion on January 18, 2020, *a year earlier than agreed upon*, and named a replacement. Complaint, ¶ 95. Ms. Tedesco retained legal counsel and filed an EEOC Charge of Discrimination. Complaint, ¶ 96. On May 5, 2020 Ms. Tedesco was approved for Long-Term Disability through April 2022, although Dr. Klenck had not yet evaluated when Ms. Tedesco might return to work. Complaint, ¶ 98, 109, and 117.

Although Ms. Tedesco had retained a legal team to help alleviate the stress of dealing with Defendant, Defendant continued to contact Ms. Tedesco directly. Complaint, ¶ 101. Defendant excluded Ms. Tedesco's counsel from these communications and exacerbated Ms. Tedesco's distress by forcing her to interact with an employee who had harassed her and mismanaged her accounts, resulting in Ms. Tedesco's health coverage nearly being cancelled. Complaint, ¶¶ 101-108. In response, Dr. Klenck again submitted medical documentation describing how this communication caused Ms. Tedesco further distress. Complaint, ¶ 109. In a subsequent letter, Dr. Klenck clarified that she was concerned about Defendant's refusal to limit or restrict Ms. Rippolone in particular from contacting Ms. Tedesco. Complaint, ¶ 117.

While the EEOC investigation was ongoing, Defendant terminated Ms. Tedesco because "her psychologist has requested that [Defendant] not communicate with her." Complaint, ¶ 111.

In this termination letter, Defendant gave no reason why it could not communicate with Ms. Tedesco through her legal team, which she retained specifically for this purpose. Ms. Tedesco's termination is highly unusual because it is against Defendant's policy to terminate employees while they are on Long-Term Disability. Complaint, ¶ 113. Although Defendant does not have to keep an employee's particular position open, they will typically have some position available within their global company to offer an employee upon their return to work. *Id.* In Ms. Tedesco's case, Defendant did not offer Ms. Tedesco any accommodation or position within the many positions available in their global company that would have satisfied Ms. Tedesco's request for accommodation and the recommendations of her doctor.

### III.   LEGAL STANDARD

Dismissal under Rule 12(b)(6) is disfavored and rarely granted. *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). Under the 12(b)(6) standard, all well-pleaded facts must be viewed in the light most favorable to the plaintiff. *Hale v. King*, 642 F.3d 492, 498-99 (5th Cir. 2011) (*en banc*). Plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim. *Id*. Courts generally confine their analysis under Rule 12(b)(6) to the complaint and its proper attachments, which "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id*., quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The well-pleaded facts must permit the court to infer more than the mere possibility of misconduct. *Id*.

## IV.   DISCUSSION

**A. That the motion should be denied because Defendant violated GINA when it requested and disclosed Ms. Tedesco's family medical history of suicide, viewed this information as an indication of Ms. Tedesco's own health status, and discriminated against her on that basis.**

Ms. Tedesco's Complaint leads with the claim that Defendant violated her rights under the Genetic Information Nondiscrimination Act (GINA).

Under GINA, it is unlawful for an employer to deliberately "request, require, or purchase genetic information with respect to an employee or a family member of the employee[.]" 42 U.S.C. § 2000ff-1(b). If an employer comes to possess genetic information, GINA requires that "such information shall be maintained on separate forms and in separate medical files and be treated as a confidential medical record of the employee." 42 U.S.C. § 2000ff–5(a). GINA also forbids the disclosure of genetic information except under the limited circumstances set out in 42 U.S.C. § 2000ff–5(b). Additionally, an employer who fires an employee or discriminates against the employee in compensation, or terms or privileges of employment based on genetic information of the employee or the employee's family violates GINA. 42 U.S.C. § 2000ff-1(a)(1).

Here, Defendant moves to dismiss the GINA claim in its entirety, on the basis that Ms. Tedesco was not required to submit to DNA testing or otherwise provide the results of a DNA test. R. Doc. 12-1 at 25. But that argument reflects a fundamental misunderstanding of the definition of "genetic information" under GINA, a statute that defines the term more broadly than the As, Ts, Cs, and Gs of a DNA test.

"Genetic information" is defined under GINA as information about (1) an individual's genetic tests; (2) the genetic tests of family members of an individual; or (3) *the manifestation of a disease or disorder in family members of an individual*. 42 U.S.C.A. § 2000ff(4) (emphasis added). The regulations issued by the Equal Employment Opportunity Commission clarify that the phrase "manifestation of a disease or disorder in family members" refers to an employee's "family

medical history," interpreted in accordance with its normal understanding as used by medical providers. 29 C.F.R. § 1635.3(c)(iii). The inclusion of family medical history in the definition of "genetic information" was deliberate – Congress did so it understood that employers could potentially use family medical history "as a surrogate for genetic traits." H.R. Rep. No. 110-28, pt. 1, at 36 (2007); *see also* S. Rep. No. 110-48, at 16 (2007).

In its Motion to Dismiss, Defendant assumes that "genetic information" means the "results of genetic testing." *See* R. Doc. 12-1 at 25 (relying on lack of "allegations that Pearson required Tedesco to undergo genetic testing (it did not)"). But because that assumption does not track the actual definition within the statute – which includes "family medical history" – the motion should be denied.

Once it is understood that "family medical history" is protected by GINA, it is clear that Ms. Tedesco alleges facts that support a *prima facie* GINA claim. To begin with, Ms. Tedesco alleges sufficient facts supporting her claim that her family history of suicide and suicidal behavior is protected genetic information under GINA. Complaint, ¶¶ 24, 34, and 125-126.

That family history concerns Ms. Tedesco's immediate, blood relative family members, from whom she is descended. Complaint, ¶¶ 24 and 34, *contrast with Poore v Peterbilt Bristol*, L.L.C., 852 F.Supp.2d 727 (W.D. Va. 2012) (family medical history not protected by GINA when not concerning blood relatives). And the complaint alleges that the history of suicide and suicidal behavior in immediate, blood-relative family members is "genetic information" under GINA because the psychological condition, disease, or disorder is hereditary. Complaint, ¶¶ 125-126. Lastly, Ms. Tedesco has provided facts supporting her allegation that Defendant viewed this information as having predictive value with respect to Ms. Tedesco's genetic propensity towards suicide and suicidal behavior. Complaint at ¶¶ 42-51, and 82.

The Complaint further alleges that Defendant violated GINA with regard to this genetic information. Most simply, the Complaint alleges specific incidents where a specific Pearson employee shared Ms. Tedesco's family medical history with another person not authorized by Ms. Tedesco. Complaint at ¶¶ 35-47 (describing that Ms. Bronson shared Ms. Tedesco's family medical history with R.B. and Ms. Morel). These facts alone establish a GINA claim under 42 U.S.C. § 2000ff–5(b), which generally bars the unauthorized sharing of genetic information.

Defendant further violated GINA when it discriminated against Ms. Tedesco by demoting, harassing, and retaliating against her immediately following the suicide of her father – *before* Ms. Tedesco manifested symptoms and was diagnosed with any psychological condition. Complaint at ¶¶ 42-51, and 82.

For the same reasons as above, Defendant also violated Louisiana Employment Discrimination Law La. R.S. 23:302 (8), La. R.S. 23:368(B)(1) and (3).

> **B. Based upon the well-pleaded facts it is plausible that Defendant violated the ADA when it ignored Ms. Tedesco's requests for accommodation, demoted her, and retaliated against her by terminating her employment.**

In its motion, Defendant goes beyond the four corners of the Complaint to put forth argumentative alternative theories that are not internally consistent with each other. A factual dispute is not a proper basis for dismissal under Rule 12(b)(6). In this case, Ms. Tedesco has alleged facts that allow this court to draw the plausible inference that the Defendant is liable for violation of Ms. Tedesco's rights under the ADA and for retaliating against Ms. Tedesco when she attempted to assert those rights.

1. <u>Ms. Tedesco has alleged facts to show that she is a "qualified individual" under the ADA.</u>

In its Motion, Defendant relies on cases applying a summary judgment standard for the proposition that Ms. Tedesco's absence from work prevented her from being a "qualified individual" under the ADA. Defendant compares Ms. Tedesco to plaintiffs in those cases who

were provided with reasonable accommodation, including creating an entirely new job position for one to lessen his stress, yet remained on leave indefinitely or simply refused to show up for work. *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395 (5th Cir. 2012); *Hypes v. First Commerce Corp.*, 134 F.3d 721 (5th Cir. 1998). In *Hypes v. First Commerce Corp.*, the court found summary judgment evidence showed the plaintiff was terminated due to excessive unexplained absenteeism beyond the approved leave and with no medical documentation. *Hypes*, 134 F.3d at 724. In *Amsel v. Tex. Water Dev. Bd.*, an unpublished decision decided on summary judgment, the plaintiff remained on indefinite leave even after his employer offered various accommodations throughout his tenure, including allowing him to telecommute, providing a flexible work schedule, and creating a new position for him when stress exacerbated his condition.

  The facts alleged by Ms. Tedesco in her Complaint are wholly dissimilar to those in *Hypes* and *Amsel*. Here, Defendant pushed Ms. Tedesco to apply for FMLA leave and disability. Complaint, ¶¶ 50-54, 131, and 139. Ms. Tedesco took the 12 weeks of leave as allowed under the FMLA. Complaint, ¶¶ 51 and 67. However, even after Ms. Tedesco returned from leave, Defendant pressured Ms. Tedesco to go back on leave against her wishes, and gave her no other option and no accommodation. Complaint, ¶¶ 76-91. Ms. Tedesco requested that she be placed in a different line of reporting or position to alleviate the stress of reporting to someone who had harassed her about her mental health condition and inappropriately disclosed her private medical history. Complaint, ¶¶ 77, 83, 140, and 152. Defendant ignored this request, failed to engage in an interactive process by suggesting any alternative, and instead continued pressuring Ms. Tedesco to take leave again, use her vacation time, or quit. Complaint, ¶¶ 86-88. Further, when Ms. Tedesco requested the accommodation, Defendant harassed her about her mental health status and whether she was a suicide risk. Complaint, ¶¶ 82 and 85. Ms. Tedesco's treating clinical psychologist, Dr. Suzanne C. Klenck, submitted medical documentation evidencing that this hostility was harmful

to Ms. Tedesco's recovery. Complaint, ¶ 94. Nevertheless, even after Ms. Tedesco retained counsel, Defendant continued to allow an employee who harassed Ms. Tedesco about her mental health status and had mismanaged Ms. Tedesco's accounts with Defendant's third-party vendors, to contact Ms. Tedesco directly without including Ms. Tedesco's counsel in communications. Complaint, ¶ 101. In response, Dr. Klenck again submitted medical documentation describing how this communication caused Ms. Tedesco further distress. Complaint, ¶ 109. In a subsequent letter, Dr. Klenck clarified that she was specifically concerned about Defendant's refusal to limit or restrict Ms. Rippolone from directly contacting Ms. Tedesco. Complaint, ¶ 117.

Lastly, in terminating Ms. Tedesco while she was on Long-Term Disability Leave, Defendant treated her differently than other employees. Unlike the employers in *Hypes* and *Amsel*, Defendant has a company policy of not laying off employees while they are on Long-Term Disability Leave. Complaint, ¶ 113.

2. <u>Ms. Tedesco has alleged facts sufficient to show that Defendant failed to engage in the interactive process when it ignored her requests for accommodation and advised that her only options were to take leave, use her vacation time, or quit.</u>

The Americans With Disabilities Act makes discrimination on the basis of disability illegal. Such discrimination is defined to include a failure to make a reasonable accommodation for an employee with a disability. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9. In order to achieve such accommodations, the ADA obligates an employer to engage in an interactive process with an employee to identify limitations and generate potential solutions. 29 C.F.R. § 1630.2(o)(3). And to protect employees who engage in this process, the ADA prohibits retaliation and interference for seeking or using reasonable accommodations. 42 U.S.C. § 12203(a); 28 U.S.C § 35.134 (Retaliation & Coercion).

Defendant claims that Ms. Tedesco refused to participate in the "interactive process," when, in reality, Defendant ignored all Ms. Tedesco's requests for accommodation from

September through November 2019. Complaint, ¶ 104. As discussed above, the only "accommodations" Defendant offered Ms. Tedesco were to take leave, use her vacation time, or quit. Complaint, ¶¶ 86-88. Only after Ms. Tedesco was represented by counsel, did Defendant make any reference to an "interactive process." Complaint, ¶¶ 101-104. Contrary to the recommendations of Dr. Klenck, Defendant continued to contact Ms. Tedesco directly. Complaint, ¶ 109 and 117. To make matters worse, Defendant excluded Ms. Tedesco's counsel from these communications and exacerbated Ms. Tedesco's distress by forcing her to interact with an employee who had harassed her and mismanaged her accounts, resulting in Ms. Tedesco's health coverage nearly being cancelled. Complaint, ¶¶ 105-108. If Defendant truly wished to engage Ms. Tedesco in an interactive process, it could have continued communications through her legal team, in observance of Dr. Klenck's recommendations. Defendant made no effort to do so.

3. <u>Ms. Tedesco has alleged facts sufficient to show Defendant demoted her and fired her under circumstances that raise a reasonable inference of unlawful discrimination.</u>

Defendant's motion offers alternative and inconsistent reasons for Ms. Tedesco's termination. According to the August 5, 2020 termination letter, Defendant fired Ms. Tedesco "[s]ince her psychologist has recommended that it not communicate with her[.]" Complaint, ¶ 111. In its motion, however, Defendant contends Ms. Tedesco was terminated because she was on a multi-year leave – not because her psychologist recommended Ms. Rippolone stop contacting Ms. Tedesco directly. R. Doc. 12-1 at 22 ("her termination was based on her multi-year leave"). Defendant's contention that Ms. Tedesco was on a multi-year leave is false. Ms. Tedesco returned from FMLA leave. Complaint, ¶ 67. After Ms. Tedesco was forced to take Short-Term Disability Leave because Defendant refused to provide any accommodation, Defendant retaliated against her by terminating her tenure as Evidence Field Champion, *a year earlier than agreed upon*, and naming her replacement. Complaint, ¶ 95. As discussed above, Ms. Tedesco only took disability

leave after Defendant refused to provide her with any accommodation or option other than to take leave or quit.

Defendant also claims they terminated Ms. Tedesco because it "could not hold her position open indefinitely." Complaint, ¶ 111. In this regard, Ms. Tedesco's termination is highly unusual because it is against Defendant's policy to terminate employees while they are on Long-Term Disability. Complaint, ¶ 113. Although Defendant does not have to keep an employee's particular position open, they will typically have some position available within their global company to offer an employee upon their return to work. *Id.* In Ms. Tedesco's case, Defendant did not offer Ms. Tedesco any accommodation or position within the many positions available in their global company that would have satisfied Ms. Tedesco's request for accommodation and the recommendations of her doctor. Furthermore, at no point did Ms. Tedesco, her doctor, or her attorneys represent that Ms. Tedesco's leave was "indefinite." She was granted Long-Term Disability through April 2022 and Dr. Klenck had not yet evaluated when Ms. Tedesco might return to work. Complaint, ¶ 98, 109, and 117.

For the same reasons as above, Defendant also violated Louisiana Employment Discrimination Law La. R.S. 23:322(3), La. R.S. 23:323(B)(1), and La. R.S. 23:323(B)(2).

### C. Defendant breached its obligation of good faith and fair dealing when it terminated Ms. Tedesco's tenure and contract of employment in violation of her rights under the Genetic Information Nondiscrimination Act and the Americans with Disabilities Act.

In her complaint, Ms. Tedesco pleads a violation of the implied covenant of good faith and fair dealing. R. Doc. 9-2 at ¶ 168. Defendant moves to dismiss that claim using a single argument: that it never formed a contract with Ms. Tedesco. R. Doc. 12-1 at 25-26. But just because the parties did not have a *written* contract does not mean they did not have a contract at all. And furthermore, while Ms. Tedesco did not begin her job with a written contract, she subsequently entered into a written agreement that contained a fixed period of employment.

Under Louisiana law, a contract is formed by the consent of the parties established through offer and acceptance. La. C.C. art. 1927. Thus, an enforceable contract requires a meeting of the minds. *State v. Pelas*, 99-0150 (La. App. 1 Cir. 11/5/99), 745 So. 2d 1215. Unless the law requires a certain formality, offer and acceptance can be made orally. La. C.C. art. 1927. The employer-employee relationship is a contractual relationship, and thus an employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy. *Quebedeaux v. Dow Chemical Co.*, 01-2297 (La. 6/21/02), 820 So. 2d 542, 545.

Absent a specific contract or agreement establishing a fixed term of employment, an "at-will" employee is free to quit at any time without liability to his or her employer and, likewise, may be terminated by the employer at any time, provided the termination does not violate any statutory or constitutional provision. *Clark v. Acco Systems, Inc.*, 899 So.2d 783 (La.App. 2 Cir. 2005) (citing La. C.C. art. 2747)(emphasis added). However, contracts must be performed in good faith. La. C. C. art.1983. An obligor in good faith is liable for the damages that were foreseeable at the time the contract was made. La. C. C. art. 1996. An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform. La. C. C. art. 1997. In an employment contract, the obligation of good faith and fair dealing is breached where an agreement is violated "with a dishonest or morally questionable motive." *Barbe v. A.A. Harmon & Co.*, 705 So.2d 1210, 1220 (La.App. 4 Cir. 1998).

Accordingly, to the extent that Defendant relies on the absence of a written agreement, its motion should be denied because the obligation of good faith and fair dealing attaches to all contracts – not just written ones. And the parties certainly had a contract, as there was a shared understanding that Ms. Tedesco would work for Pearson, and in exchange Pearson would pay her for that work.

Furthermore, although Ms. Tedesco may have begun her job without a written contract, one was entered during her employment. After Ms. Tedesco exhibited exemplary sales performance, as Defendant offered Ms. Tedesco a highly coveted position in a company leadership training program known as the "Evidence Field Champion," which included a stipend and seminars in exchange for Ms. Tedesco's participation. Complaint, ¶ 64. Ms. Tedesco accepted the position. *Id.* Ms. Tedesco's tenure in this program was set to last 18 months beginning in August 2019 and **ending January 2021**. *Id.* However, after Defendant forced Ms. Tedesco to take disability leave, with no alternative but to quit, Pearson manager Bill Schoof sent an email out that stated Ms. Tedesco's tenure as Evidence Field Champion ended on December 31, 2019, *a year earlier than agreed upon*, and named Ms. Tedesco's replacement as Evidence Field Champion. Complaint, ¶ 95.

V.   CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendant's motion.

Respectfully Submitted:

**MOST & ASSOCIATES**

/s/ Hope A. Phelps
**HOPE PHELPS (La. Bar No. 37259)**
**WILLIAM MOST (La. Bar No. 36914)**
**DAVID LANSER (La. Bar No. 37764)**
**CAROLINE GABRIEL (La. Bar. No. 38224)**
201 St. Charles Ave., Ste. 114, # 101
New Orleans, LA 70170
Tel: 504.256.4615
Email: hopeaphelps@outlook.com

*Counsel for Plaintiff, Tiffanie Tedesco*