**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **TIFFANIE TEDESCO** | **CIVIL ACTION** |
| **VERSUS** | **No. 21-199** |
| **PEARSON EDUCATION, INC., ET AL.** | **SECTION I** |

**ORDER & REASONS**

Plaintiff Tiffanie Tedesco ("Tedesco") alleges that her former employer, defendant Pearson Education, Inc. ("Pearson"), discriminated against her based on her genetic information and mental disability. Now before the Court is Pearson's motion[1] to dismiss Tedesco's complaint, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. Tedesco opposes[2] the motion, to which Pearson replied.[3] The motion is granted in part and denied in part for the reasons below.

**I.**[4]

Tedesco was a high-performing sales representative for Pearson's Higher Education Division.[5] In 2017 and 2018, Pearson awarded her with membership in the President's Club, an honor reserved for the top 1% of Pearson's sales personnel.[6] In 2018, she won the Pearson Award for having the highest cumulative sales over the

---

[1] R. Doc. No. 12.
[2] R. Doc. No. 15.
[3] R. Doc. No. 20.
[4] The following facts were taken exclusively from Tedesco's complaint, and the Court accepts them as true for purposes of deciding this Rule 12(b)(6) motion.
[5] R. Doc. No. 1, at 4 ¶¶ 12, 16, 19.
[6] *Id.* at 5 ¶ 21.

previous three years.[7] She was also selected by Pearson's executive board to join the firm's Developing Leaders program, a "highly coveted" opportunity in a program that "exists to transition employees into upper-management level roles."[8] In short, Pearson "considered [her] a leader," "placed her in a training path for leadership and management roles," and "highly regarded" her "opinions."[9]

After her father's tragic suicide on December 31, 2018, however, Tedesco struggled to maintain that success.[10] She sought psychiatric treatment in January 2019 and was "[u]ltimately" diagnosed with "Major Depressive Disorder, Post-Traumatic Stress Disorder, and Passive Suicidal Ideation."[11]

***Tedesco's Early Interactions with Supervisors & Co-Workers***

The fallout after her father's death bled into Tedesco's work. In mid-January 2019, her direct supervisor, Ty Olden ("Olden"), asked her to take a "certification test, which was an intensive internal test covering a wide range of higher education subjects and disciplines relevant to Pearson's product catalog."[12] But because "Olden expected Ms. Tedesco to perform at her usual high-achieving level, Ms. Tedesco felt pressured to specify to Mr. Olden that her father died from a violent suicide and she, therefore, feared she could not perform on the test as expected."[13]

---

[7] *Id.* at 5 ¶ 23.
[8] *Id.* at 5 ¶¶ 21–22.
[9] *Id.* at 4 ¶¶ 17–18.
[10] *Id.* at 5 ¶¶ 24–26.
[11] *Id.* at 6 ¶ 33. She also "learned," in "mid-March of 2019," that "her great-grandmother also died by suicide." *Id.* at 6 ¶ 34. The complaint does not allege, however, that Pearson ever learned of or elicited this information from Tedesco.
[12] *Id.* at 5 ¶ 27.
[13] *Id.* at 6 ¶ 28.

Olden explained that, to relieve Tedesco of her obligation to take the certification test, "he would need to tell" Jeanne Bronson ("Bronson"), Pearson's Vice-President of Sales and his direct supervisor.[14] Tedesco responded that she "underst[oo]d" if Olden needed to tell Bronson, but she "clarified that the details were 'my story to tell.'"[15] That is, Olden could share that information with Bronson only "to the extent necessary to exempt Ms. Tedesco from the certification test."[16] However, Tedesco alleges that Olden "gratuitously shared [her] private genetic information regarding [her] family history of suicide and [her] genetic predisposition to mental health issues with" Bronson.[17] And Bronson, in turn, shared that news with Pearson's managing director, "R.B."[18]

In March 2019, allegedly per Bronson's instructions, R.B. then called Tedesco to "obtain more information from Ms. Tedesco."[19] "R.B. began the conversation by saying 'my condolences about your father.'"[20] R.B. then "shared intimate details of her own life involving a suicide and thereby prompted" Tedesco to "open up," prompting Tedesco to share "details" regarding her "private genetic information and mental health."[21] Tedesco claims that these actions—requesting, then sharing internally, information concerning her father's suicide—among other retaliatory

---

[14] *Id.* at 6 ¶ 29.
[15] *Id.* at 6 ¶ 30.
[16] *Id.* at 6 ¶ 31.
[17] *Id.* at 6 ¶ 32.
[18] *Id.* at 7 ¶ 36. R.B.'s full name is not provided in the complaint.
[19] *Id.* at 7 ¶ 38.
[20] *Id.* at 7 ¶ 39.
[21] *Id.* at 7 ¶ 39.

actions described below, violated her rights under the Genetic Information Nondiscrimination Act.

On April 3, 2019, Bronson suggested that Tedesco "update her resume because layoffs were coming."[22] The next day, after Tedesco had a meal with a client, Bronson arrived at the restaurant and "became agitated with Ms. Tedesco."[23] Tedesco claims that Bronson "raised her voice" at Tedesco and "said 'You're acting manic! You need to get some help. I've never dealt with suicide before.'"[24] Bronson later admitted that she shared "the details of" Tedesco's father's suicide with R.B. and asked her to "question [Tedesco] regarding her mental health status."[25] On April 7, 2019, Tedesco filed for FMLA leave, to begin immediately, because Pearson management was "treating her with severe hostility and harassing her due to her mental condition."[26]

On July 1, 2019, Tedesco's tenure as Pearson's "Evidence Field Champion"—a "Pearson Peer Leadership Role" that is "reserved for high-achieving sales representatives"—was renewed for another eighteen months, to begin in August 2019 and end January 2021.[27]

Tedesco returned from her first FMLA leave on July 15, 2019.[28] However, Tedesco complained that "her superiors . . . treated her as if she were untrustworthy

[22] *Id.* at 7 ¶ 40.
[23] *Id.* at 7 ¶ 42
[24] *Id.* at 7 ¶ 43.
[25] *Id.* at 8 ¶ 45.
[26] *Id.* at 8 ¶ 51.
[27] *Id.* at 10 ¶ 64–66.
[28] *Id.* at 10 ¶ 67.

and incompetent to perform her job."[29] For example, when Tedesco attempted to relay to Olden a problem that a client was having, Olden responded by screaming and cursing at her.[30] Tedesco describes this as a "pattern of behavior from Pearson management."[31] That "discriminatory and harassing treatment . . . exacerbated" Tedesco's depression, PTSD, and suicidal ideation.[32]

***Tedesco's Accommodation Requests & Pearson's Response***

On September 14, 2019, Tedesco filed an internal complaint with Pearson "regarding Ms. Bronson's hostility towards her."[33] Between then and November 2019, Tedesco "reported several incidents of harassment, retaliation, [and] hostile work environment" to human resources, in which she "attempted to receive reasonable accommodation."[34] The accommodations she requested "were (1) to not be forced to take leave; and (2) to be placed in a line of reporting wherein she could work free from the ongoing hostility, harassment, and questioning regarding her mental condition and competency."[35] Such requests would allegedly not have been difficult for Pearson to accommodate, since Pearson "will typically have some position available within their global company to offer an employee."[36]

---

[29] *Id.* at 10 ¶ 68.
[30] *Id.* at 10 ¶ 69. Olden "screamed at her[,] 'Are you calling about [redacted] University? I don't want to fucking hear it!'" *Id.*
[31] *Id.* at 10 ¶ 70.
[32] *Id.* at 10 ¶ 71.
[33] *Id.* at 11 ¶ 73.
[34] *Id.* at 11 ¶ 76.
[35] *Id.* at 11 ¶ 77.
[36] *Id.* at 16 ¶ 113.

On September 25, 2019, a Pearson human resources representative told Tedesco that R.B. thought she should go back on leave.[37] Tedesco responded that she did not want to take leave again.[38] On September 28, the same representative called Tedesco again and asked if she "was suicidal."[39] Tedesco responded in the negative and reiterated that she did not want to go back on leave.[40] Instead, Tedesco asked that "she be placed in a different position with Pearson due to the hostility she was experiencing in her current placement under [her direct supervisor,] Olden."[41] The representative rejected Tedesco's request and did not suggest any alternatives other than that Tedesco take leave or vacation; instead, the representative "interrogat[ed]" Tedesco about whether she "would self-harm."[42] Immediately after the phone call, Tedesco requested vacation, as directed by the representative.[43]

On September 30, 2019, Tedesco and R.B. (Pearson's managing director) spoke via phone; R.B. told Tedesco that she "had R.B.'s full support to quit her job with Pearson."[44] R.B. knew that Tedesco wished to continue working for Pearson,[45] but provided no option other than resignation.[46] The next day, Tedesco took vacation "to avoid being forced to take leave again."[47] The complaint does not state how long this

---

37 *Id.* at 12 ¶ 78.
38 *Id.* at 12 ¶ 81.
39 *Id.* at 12 ¶ 82.
40 *Id.*
41 *Id.* at 12 ¶ 83.
42 *Id.* at 12 ¶¶ 85–86.
43 *Id.* at 13 ¶ 87.
44 *Id.* at 13 ¶ 88.
45 *Id.*
46 *Id.* at 13 ¶ 89.
47 *Id.* at 13 ¶ 90.

vacation lasted, or whether it was in addition to the one requested on September 28. However, on October 18, Tedesco "had no choice but to file a claim for Short-Term Disability as she could no longer work without an accommodation."[48] Those disability benefits began on November 4.[49]

On November 20, 2019, Tedesco emailed human resources "regarding the status of her complaint against" Bronson; the representative responded that Tedesco should not be working while on leave and, as Tedesco puts it, "suggest[ed] her mental condition was questionable."[50]

On January 18, 2020, a Pearson manager emailed Pearson employees to state that Tedesco's tenure as Evidence Field Champion ended on December 31, 2019, "a year earlier than promised," and named Ms. Tedesco's replacement in that role.[51] Tedesco was later approved, on May 5, 2020, for long-term disability leave through April 27, 2022.[52]

***Tedesco Files EEOC Charges & is Terminated***

On April 23, 2020, Tedesco filed a charge of discrimination with the EEOC, alleging that Pearson discriminated and retaliated against her based on genetic information and disability.[53] After an unsuccessful EEOC mediation, the case was transferred to the EEOC's investigative division.[54] On July 23, Pearson's H.R.

---

[48] *Id.* at 13 ¶ 91.
[49] *Id.* at 13 ¶ 92.
[50] *Id.* at 13 ¶ 93.
[51] *Id.* at 13 ¶ 95.
[52] *Id.* at 14 ¶ 98.
[53] *Id.* at 14 ¶ 96.
[54] *Id.* at 14 ¶¶ 99–100.

representative emailed Tedesco "requesting additional medical information regarding [her] ability to perform essential work functions and [her] return date."[55] On July 31, Tedesco's psychologist responded with a letter, reporting that Tedesco was disabled and that returning to work would negatively affect her recovery.[56]

On August 5, 2020, Pearson terminated Tedesco's employment.[57] The termination letter explained that Pearson "has no choice but to terminate Ms. Tedesco's employment as it cannot hold her position open indefinitely."[58] On August 28, Tedesco filed a second charge of discrimination with the EEOC, alleging that Tedesco's termination constituted retaliation against Tedesco for her disclosing genetic information, requesting accommodation, and filing the original EEOC charge.[59] The EEOC issued Tedesco notices of a right to sue on November 3, and she timely filed this lawsuit within ninety days.[60]

Tedesco brings five claims: (1) "violations of rights" under the Genetic Information Nondiscrimination Act ("GINA");[61] (2) "violations of rights" under the Americans with Disabilities Act ("ADA"),[62] which Pearson treats as both discrimination and failure-to-accommodate claims;[63] (3) unlawful retaliation under

---

[55] *Id.* at 14 ¶ 101.
[56] *Id.* at 15 ¶ 109.
[57] *Id.* at 15 ¶ 110.
[58] *Id.* at 15 ¶¶ 110–12.
[59] *Id.* at 16–17 ¶ 118.
[60] *Id.* at 17 ¶ 120.
[61] *Id.* at 17–19 ¶¶ 121–32.
[62] *Id.* at 19–21 ¶¶ 133–48.
[63] R. Doc. No. 12-1, at 19 n.4.

the ADA;[64] (4) comparable genetic-information-based and disability-based claims under the Louisiana Employment Discrimination Law ("LEDL");[65] and (5) a state-law claim for breach of the implied covenant of good faith and fair dealing.[66]

**II.**

Pursuant to Rule 12(b)(6), a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. Proc. 8(a)(2)) (alteration in original).

In assessing the complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Gentilello v.*

---

[64] R. Doc. No. 1, at 21–22 ¶¶ 149–54.
[65] *Id.* at 22–23 ¶¶ 155–63.
[66] *Id.* at 23–24 ¶¶ 164–68.

*Rege*, 627 F.3d 540, 543–44 (5th Cir. 2010). However, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005). Furthermore, "the Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, No. 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 16, 2011) (Vance, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) (alteration in original)).

**III.**

Before the Court analyzes the merits of Pearson's motion, it pauses to clarify what it is and is not considering. Attached to Pearson's Rule 12(b)(6) motion and referenced throughout it are a number of documents that, it says, are clearly referenced in Tedesco's complaint and central to her claims.[67]

Under Federal Rule of Civil Procedure 12(d), "[w]hen a party bases a motion to dismiss on matters outside the pleadings, the court has discretion either to accept the extraneous material and convert the motion to dismiss into a motion for summary judgment, or to decide the motion, as defendant styled it, under the principles of Rule 12(b)(6)." *Rubio v. Hyatt Corp.*, No. 17-7833, 2017 WL 5177943, at *2 (E.D. La. Nov. 8, 2017) (Barbier, J.) (quoting *McDonald v. Kansas City S. Ry. Co.*, No. 16-15975,

---

[67] R. Doc. No. 12-1, at 7.

2017 WL 1709353, at *2 (E.D. La. May 3, 2017) (Vance, J.)); *see also* 5C Wright & Miller, *Fed. Prac. & Proc.* § 1366 (3d ed.) ("[F]ederal courts have complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider.").

Pearson argues that the Court may consider the exhibits attached to its motion to dismiss without converting it to a summary-judgment motion "because they are '(1) attached to the motion; (2) referenced in the complaint; and (3) central to the plaintiff's claims.'"[68] The first point is true, the second is generally true,[69] but the third is overstated. Even assuming every attached exhibit is sufficiently referenced in the complaint, it is difficult to discern how all are categorically "central to [Tedesco's] claims"—as is required to be considered without converting Pearson's motion into a motion for summary judgment. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014); *cf. SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20-2970, 2021 WL 1226411, at *6 n.35 (E.D. La. Apr. 1, 2021) (Vance, J.) (finding terms and conditions document, which purported to be part of the "agreement between the parties," was central to the plaintiff's breach of contract claim).

---

[68] R. Doc. No. 12-1, at 7 (quoting *Maloney Gaming Mgmt., L.L.C. v. St. Tammany Par.*, 456 F. App'x 336, 340–41 (5th Cir. 2011)).

[69] Some of the exhibits are indirectly referenced in the complaint. *See, e.g.*, R. Doc. No. 1, at 13 ¶ 93 ("On November 20, 2019, Ms. Tedesco emailed Mr. Grunwald regarding the status of her complaint against Ms. Bronson for violation of Pearson's code of conduct."); R. Doc. No. 12-6 (the referenced email).

Moreover, Pearson makes no argument as to how each of these exhibits are so central to Tedesco's claims—other than by a single, blanket assertion.[70] These documents and the factual arguments they support are better considered in a timely motion for summary judgment. *See Express Lien, Inc. v. Handle, Inc.*, No. 19-10156, 2020 WL 1030847, at *10 (E.D. La. Mar. 3, 2020) (Vance, J.) (concluding the same and noting the court's "complete discretion to determine whether or not to accept any material beyond the pleadings" when deciding a Rule 12(b)(6) motion (quoting *Isquith ex rel. Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 194 n.3 (5th Cir. 1988))).

Accordingly, for purposes of Rule 12(d), the Court notes that it will not consider any of the exhibits attached to Pearson's motion to dismiss; it will assume the truth of all well-pleaded facts in Tedesco's complaint.

## IV.

### A. Tedesco's GINA Claims Must be Dismissed

The Genetic Information Nondiscrimination Act ("GINA") prohibits employers from taking adverse actions against an employee "because of genetic information with respect to the employee." 42 U.S.C. §§ 2000ff-1(a)(1), (2). GINA also makes it unlawful, with some exceptions,[71] for employers to "request, require, or purchase

---

[70] *See* R. Doc. No. 12-1, at 7 (arguing that "the Court may consider them . . . because they are . . . 'central to the plaintiff's claims'" (quoting *Maloney Gaming Mgmt.*, 456 F. App'x at 340–41)).

[71] Two exceptions potentially relevant here are (1) "where an employer *inadvertently* requests or requires family medical history of the employee or family member of the employee," 42 U.S.C. § 2000ff-1(b)(1) (emphasis added), and (2) "where an employer requests or requires family medical history from the employee to comply with the certification provisions of" the Family and Medical Leave Act or its state-law

genetic information with respect to an employee or a family member of the employee." *Id.* § 2000ff-1(b). At issue here is whether GINA is even implicated by this case—that is, whether Pearson obtained "genetic information" as GINA defines it.

"For purposes of GINA, 'genetic information' means information about the 'genetic tests' of an individual or her family members, and information about 'the manifestation of a disease or disorder in family members of such individual.'" *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 826 (5th Cir. 2015) (quoting 42 U.S.C. § 2000ff(4)(A)). But a mere diagnosis of a disease or disorder in a family member "is not considered 'genetic information' if 'such information is taken into account only with respect to the individual in which such disease or disorder occurs and not as genetic information with respect to any other individual.'" *Poore v. Peterbilt of Bristol, L.L.C.*, 852 F. Supp. 2d 727, 731 (W.D. Va. 2012) (quoting H.R. Rep. No. 110-28, pt. 2, at 27 (2007), 2008 U.S.C.C.A.N. 101, 105–06). In other words, "evidence of a family member's disease diagnosis is only considered 'genetic information' if used to determine the likelihood of disease in another individual." *Allen v. Verizon Wireless*, No. 12-482, 2013 WL 2467923, at *23 (D. Conn. June 6, 2013) (citing *Poore,* 852 F. Supp. 2d at 731).

Tedesco argues that GINA "defines ['genetic information'] more broadly than the As, Ts, Cs, and Gs of a DNA test."[72] She asserts that "[s]uicide and suicidal behavior are highly familial" and cites a study and a WebMD article that, she says,

---

equivalent, *id.* § 2000ff-1(b)(3). Since the Court concludes that Pearson never obtained genetic information, it need not reach these exceptions.

[72] R. Doc. No. 15, at 5.

"support the view that . . . the transmission of suicidal behavior is at least in part genetic."[73] She concludes that "[i]nformation about the manifestation of mental health issues and suicide in Tiffanie Tedesco's family members is protected genetic information under GINA."[74] Employing that definition, she alleges that the "deliberate[] request[s]" from multiple Pearson employees about "the manifestation of mental health issues and suicide in Ms. Tedesco's family," along with their sharing of that information, without Tedesco's prior written authorization, violated GINA. *See* 42 U.S.C. § 2000ff-1(b)(2)(B).[75] Similarly, Pearson "discriminated" against Tedesco "by forcing her to take FMLA leave, which interfered with the terms or privileges of her employment as a salesperson."[76]

Pearson argues that its knowledge of the suicide alone—even alongside knowledge that suicide may generally have a genetic basis—is not enough to transform that knowledge into genetic information. Instead, "Pearson must also possess knowledge that [Tedesco's] father's suicide was related to his genetic makeup, and not, for example, prompted by outside stressors, neurological disease, or environmental factors. [Tedesco] has made no allegations that she supplied any such

---

[73] R. Doc. No. 1, at 17–18 ¶ 125. Pearson argues that the principal study cited by Tedesco is more equivocal, quoting the study: "'at best only 50% of the variance is explained by genes,' and manifestation of suicide is also caused by 'neuroticism and neurocognitive deficits,' 'environmental factors,' and 'interaction with a stressful environment.'" R. Doc. No. 20, at 3 (quoting David A. Brent & Nadine Melhem, 31:2 *Familial Transmission of Suicidal Behavior*, Psych. Clinics of N. Am., at 157–77 (2008)).
[74] R. Doc. No. 1, at 18 ¶ 126.
[75] *Id.* at 18 ¶¶ 128–29.
[76] *Id.* at 18–19 ¶¶ 130–32.

information to Pearson."[77] Pearson concludes that "it is neither Pearson's nor this Court's responsibility to determine if Plaintiff's father's suicide was related to a genetic condition or not. To state a claim, Plaintiff must simply allege that she specifically told Pearson that her father's suicidal tendency was specifically linked to a genetic condition."[78] The Court agrees with Pearson for two reasons.

First, GINA's definition of genetic information is not as broad as Tedesco makes it out to be. Although it is true that GINA defines "genetic information" to include family medical history, that was done to prevent employers from using such information "as a surrogate for genetic traits." *Poore*, 852 F. Supp. 2d at 730 (quoting H.R. Rep. No. 110-28, pt. 1, at 36 (2007), 2008 U.S.C.C.A.N. 66, 80). It therefore follows that, to state a claim under GINA, the plaintiff must allege at least that the employer, when requesting family medical history, believed it was dealing with genetic information. Holding otherwise could impose liability on employers merely for inquiring about the health or safety of an employee's family member, a scenario to which the relevant regulations expressly counsel against applying GINA. *See* 29 C.F.R. § 1635.8(b)(1)(ii)(B) (providing that the "inadvertent acquisition of genetic information" exception applies if the employer collected genetic information, *inter alia*, "in response to an ordinary expression of concern" for the employee or a family member and providing examples).[79]

---

[77] R. Doc. No. 20, at 3.
[78] *Id.* at 3–4.
[79] These examples include:

> For example, the exception applies when the covered entity, acting through a supervisor or other official, receives family medical history

The Fifth Circuit has not determined when family medical history crosses the line to become genetic information, and this Court has not found a single case applying GINA to claims involving a family history of suicide. There have been several cases, however, that have accepted the premise that genetic information includes the manifestation of cancer in family members. *See Punt v. Kelly Services*, 862 F.3d 1040, 1052 (10th Cir. 2017) (accepting premise as to family history of breast cancer, but concluding employer did not discriminate against employee "because of" this genetic information); *Jackson v. Regal Beloit America, Inc.*, No. 16-134, 2018 WL 3078760, at *15 (E.D. Ky. June 21, 2018) (concluding history of colon cancer was genetic information). In those cases, unlike here, there was no question that the employer knew the disease at issue had a genetic cause.

Here, however, Tedesco does not allege that Pearson knew her father's suicide was caused by a genetic condition—or even that Pearson knew that it *could have* been so caused. Without such an allegation, Tedesco fails to state a claim that Pearson collected what it believed to be genetic information—information that could predict Tedesco's mental condition. Based on the complaint's allegations, Pearson was

---

> directly from an individual following a general health inquiry (e.g., "How are you?" or "Did they catch it early?" asked of an employee who was just diagnosed with cancer) or a question as to whether the individual has a manifested condition. Similarly, a casual question between colleagues, or between a supervisor and subordinate, concerning the general well-being of a parent or child would not violate GINA (e.g., "How's your son feeling today?", "Did they catch it early?" asked of an employee whose family member was just diagnosed with cancer, or "Will your daughter be OK?").

29 C.F.R. § 1635.8(b)(1)(ii)(B).

asking only about an employee's tragic loss of a family member. It would be one thing if the *only* cause of suicide is genetic; then, perhaps, Pearson may be held liable for requesting information about it—since it is information concerning a solely genetic disorder. But Tedesco does not even allege that, instead claiming only that "transmission of suicidal behavior is *at least in part* genetic."[80] That is insufficient under GINA, absent allegations that Pearson knew otherwise.

Second, Tedesco "ignores the statutory distinction between 'medical information' and 'genetic information.'" *Ortiz,* 806 F.3d at 826. GINA specifically exempts "the use, acquisition, or disclosure of *medical information* that is not genetic information about a *manifested* disease, disorder, or pathological condition of an employee or member, including a manifested disease, disorder, or pathological condition that has or may have a genetic basis." 42 U.S.C. § 2000ff-9 (emphasis added). "A disease, disorder, or pathological condition is considered 'manifested' if the individual 'has been or could reasonably be diagnosed with the disease, disorder, or pathological condition by a healthcare professional[.]' A disease, disorder, or pathological condition is not considered manifested 'if the diagnosis is based principally on genetic information.'" *Equal Emp. Opportunity Comm'n v. Grisham Farm Prod., Inc.*, 191 F. Supp. 3d 994, 997–98 (W.D. Mo. 2016) (quoting 29 C.F.R. § 1635.3(g)). Accordingly, if the information relates to a condition that has manifested in the employee, the information is medical, not genetic—notwithstanding whether the condition has a genetic basis.

---

[80] R. Doc. No. 1, at 17–18 ¶ 125 (emphasis added).

Here, the complaint states that Tedesco began medical treatment in "January of 2019" following her father's suicide, which occurred on December 31, 2018. She was "ultimately" diagnosed with a variety of psychological disorders. Accordingly, to the extent her father's suicide was caused by a genetic mental disorder, as Tedesco alleges, that condition had already manifested in Tedesco—sometime in or shortly after January 2019—taking it out of the scope of the "genetic information" definition and into the "medical information" exclusion.

For these two reasons, the Court dismisses Tedesco's GINA claims, as ordered below.

**B. Tedesco's ADA-Based Discrimination, Failure-to-Accommodate, and Retaliation Claims Survive**

A plaintiff alleging disability discrimination need not produce evidence of a *prima facie* case to survive a Rule 12(b)(6) motion to dismiss. *Stone v. La. Dept. of Revenue*, 590 F. App'x 332, 339 (5th Cir. 2014). But she must still "plead sufficient facts on all of the ultimate elements . . . to make her case plausible." *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 470 (5th Cir. 2016). "[I]t can be helpful to reference the *McDonnell Douglas* framework" to answer that question—even in cases arising under the ADA. *Id.*; *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009) (applying *McDonnell Douglas* to a disability discrimination claim). And when the plaintiff has only circumstantial evidence of discrimination, *McDonnell Douglas* governs the ultimate analysis. *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 582 (5th Cir. 2020) (explaining that a plaintiff "may either present direct evidence that [he] was discriminated against . . . or alternatively proceed under"

*McDonnell Douglas*), *cert. denied sub nom. Clark v. Inco Champion Nat'l Sec., Inc.*, 141 S. Ct. 662.

"To establish a *prima facie* discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability." *Clark*, 952 F.3d at 582 (quoting *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 417 (5th Cir. 2017)). As for a failure-to-accommodate claim, the plaintiff must allege and ultimately prove that "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013) (quoting *Mzyk v. N.E. Indep. Sch. Dist.*, 397 F. App'x 13, 16 (5th Cir. 2010)).

And as for a *prima facie* retaliation claim, a plaintiff must allege and ultimately prove that "(1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the first two elements." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 317 n.3 (5th Cir. 2007) (citing *Sherrod v. Am. Airlines, Inc.,* 132 F.3d 1112, 1122 n.8 (5th Cir. 1998)). Pearson appears to assume that Tedesco has sufficiently alleged the first two elements.[81] The Court will do the same.[82]

---

[81] *See* R. Doc. No. 12-1, at 22–23 (citing the three-part retaliation test and arguing only that causation was not sufficiently alleged).

[82] These appear to be safe assumptions: the Fifth Circuit has noted that "[e]very appeals court to consider this issue has concluded that [a request for accommodation] is protected as long as the employee had the reasonable belief that he was covered by

Tedesco's complaint alleges three claims under the ADA: discrimination, failure-to-accommodate, and retaliation.[83] Pearson makes four arguments for dismissal: (1) Tedesco could not perform the essential functions of her job and therefore was not a "qualified individual" for ADA purposes, which defeats her disability-discrimination and failure-to-accommodate claims; (2) she did not engage in the "interactive process," so her failure-to-accommodate claim must fail; (3) her termination was based on her indefinite multi-year leave, which Pearson was not required to accommodate; and (4) even if Tedesco could establish a *prima facie* case of discrimination or retaliation, Pearson terminated her employment because of non-discriminatory reasons—her multi-year leave—so her retaliation claim must fail.[84] The Court rejects all four arguments.

*1. Tedesco was a Qualified Individual*

As to the first argument: to claim the ADA's protection, Tedesco must allege facts showing that she was a "qualified individual"—"an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). "Fact-finders must determine whether a function is 'essential' on a case-by-case basis." *Credeur v. La. ex rel. Office of*

---

the ADA." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 620 n.9 (5th Cir. 2009). Termination, likewise, is an adverse employment action. *Grubic v. City of Waco*, 262 F. App'x 665, 667 (5th Cir. 2008).

[83] Tedesco's second cause of action alleges "violation of rights" under the ADA, which Pearson treats as "potential claims for both discrimination and failure-to-accommodate." R. Doc. No. 12-1, at 19 n.4 (quoting R. Doc. No. 1, at 19 ¶¶ 133–48) (internal quotation marks omitted). The Court treats them the same.

[84] R. Doc. No. 12-1, at 19–24.

*Attorney General*, 860 F.3d 785, 792 (5th Cir. 2017) (quoting *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 698 (5th Cir. 2014)) (internal quotations omitted).

To argue that Tedesco was not a qualified individual, Pearson relies solely on the FMLA and disability leave that Tedesco took prior to her termination. It argues that "[a]ttendance at work, the most basic element of an employee's duties, is an essential element of all jobs,"[85] and "[i]ndefinite leave is not a reasonable accommodation."[86] It points to the fact that Tedesco has been on long term disability leave since October 2019[87]—implying that she insisted on never returning to work.

But that argument ignores Tedesco's core factual allegation: that she was able, and wanted, to work for Pearson—but in a different line of reporting.[88] Tedesco has very clearly alleged that "[t]he accommodations she requested were (1) to not be forced to take leave; and (2) to be placed in a [different] line of reporting."[89] She alleged that it was *Pearson* officials who "suggested" that she go on leave[90]—Tedesco "request[ed] that she *not* be forced to take leave."[91] Pearson insisted on such leave

---

[85] R. Doc. No. 12-1, at 21 (citing *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998)).
[86] *Id.* (quoting *Amsel v. Tex. Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012)) (internal quotations omitted).
[87] *Id.*
[88] Pearson does not argue that such an accommodation would have amounted to an undue hardship. *See* 42 U.S.C. §§ 12111(10)(A)–(B) (defining undue hardship); *id.* § 12112(b)(5)(A) (providing that an accommodation need not be provided where the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business").
[89] R. Doc. No. 1, at 11 ¶ 77; *see also id.* at 12 ¶ 83 (requesting a different position).
[90] *Id.* at 8 ¶ 50 ("Ms. Morel suggested Ms. Tedesco take FMLA leave.").
[91] *See id.* at 12 ¶ 79 (emphasis added); *id.* at 12 ¶ 81 ("But Ms. Tedesco did not want to take leave.").

even after Tedesco requested the accommodation, a request that Pearson acknowledged but did not act upon.[92] Pearson may be correct that attendance at work is an essential element of all jobs, but Tedesco never asked to be exempt from attendance; she asked to be accommodated through placement in a separate line of reporting.

Further, although Pearson is correct that "'[i]indefinite leave is not a reasonable accommodation,' [Tedesco's] complaint does not allege that she requested additional leave from work without an end date." *Oncale v. CASA of Terrebonne Parish, Inc.*, No. 19-14760, 2020 WL 3469838, at *8 (E.D. La. June 25, 2020) (Africk, J.) (quoting *Amsel*, 464 F. App'x at 400). As just explained, Tedesco requested to be accommodated through placement in a separate line of reporting. And the complaint alleges a more definite return date than Pearson suggests: Tedesco was approved for long-term disability leave only through April 27, 2022.[93] Further, Tedesco alleges it was against Pearson policy to terminate employees who are on long-term disability,[94] which suggests Pearson treated Tedesco differently than other employees on

---

[92] *Id.* at 12 ¶ 78 ("Mr. Grunwald[] told Ms. Tedesco that he spoke with R.B. regarding Ms. Tedesco's *requested accommodations* and options, and that R.B. thought Ms. Tedesco should go back on leave." (emphasis added)); *id.* at 12 ¶¶ 83–84 ("Ms. Tedesco requested a reasonable accommodation, namely that she be placed in a different position with Pearson due to the hostility she was experiencing in her current placement under Ty Olden. . . . Ms. Rippolone rejected Ms. Tedesco's request and did not suggest any alternatives."); *id.* at 14 ¶ 104 ("Ms. Tedesco responded to Pearson management explaining how her requests for accommodation from September through November 2019 were ignored and there was no 'interactive process.'").

[93] *Id.* at 14 ¶ 98. To the extent the letter sent by Tedesco's psychologist, *see* R. Doc. No. 12-1, at 21 (discussing the letter), suggests a less definite end-date, it is not conclusive proof of such.

[94] R. Doc. No. 1, at 16 ¶ 113.

disability leave. While Pearson criticizes Tedesco for not "presenting that policy or its contents,"[95] it is not her burden to do so to avoid dismissal. Tellingly, Pearson stops short of claiming that it does not have such a policy.[96]

All told, Tedesco has plausibly alleged that she was a qualified individual.

*2. Interactive Process*

Next, Pearson insists—contrary to Tedesco's well-pleaded facts—that she "refused to engage in the interactive process."[97] The "interactive process" is ADA jargon for the procedure that identifies workable accommodations for disabled employees. It obligates employers, once an employee requests and suggests an accommodation for a disability, to engage in "'a meaningful dialogue with the employee to find the best means of accommodating that disability.' The process thus requires 'communication and good-faith exploration.'" *Chevron Phillips*, 570 F.3d at 621 (quoting *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir. 2005), and *Kleiber v. Honda of Am. Mfg.,* 485 F.3d 862, 871 (6th Cir. 2007)) (cleaned up).

Based on Tedesco's well-pleaded facts, it was *Pearson* that refused to engage in the interactive process. Tedesco's requests for accommodation were made between September and November 2019.[98] Instead of coordinating with Tedesco to develop a

[95] R. Doc. No. 20, at 5.
[96] *See id.* This is telling because, as noted, Pearson attached several documents to rebut some of Tedesco's other allegations—or at least noted when such documentary evidence does *not* exist. *See* R. Doc. No. 12-1, at 25–26 ("Pearson cannot attach the referenced employment contract because none exists, as Plaintiff was an at-will employee."). Pearson fails to note here that the referenced policy does not exist.
[97] R. Doc. No. 12-1, at 22.
[98] R. Doc. No. 1, at ¶ 104.

mutually agreeable accommodation, Pearson responded by telling her to take leave, use her vacation time, or quit.[99] By April 23, 2020, Tedesco's requests remained unanswered, and she retained counsel.[100] Pearson did not attempt to engage Tedesco in its "interactive process" until July 23, 2020.[101]

Pearson does not challenge any part of that timeline. Its only argument is that Tedesco failed to engage in the interactive process following the July 2020 email,[102] which Pearson (implicitly) argues is enough to have absolved it of any obligation to respond to Tedesco's earlier requests. The Court is not so convinced—the interactive process is a two-way street. *See, e.g.*, *Chevron Phillips*, 570 F.3d at 621 ("When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations.").

Although it may be possible that Tedesco's conduct and manner of requesting accommodations contributed to a breakdown in the interactive process, that is a factual question unfit for resolution on a motion to dismiss. *See Stokes v. Nielsen*, 751 F. App'x 451, 455 (5th Cir. 2018) (vacating grant of summary judgment for the employer because a factual dispute existed as to whether the employee caused the breakdown). Instead, accepting as true the facts in Tedesco's complaint, she

---

99 *Id.* at 12–13 ¶¶ 86–88.
100 *Id.* at 14 ¶ 96.
101 *Id.* at 14 ¶ 102.
102 R. Doc. No. 12-1, at 22.

sufficiently engaged in the interactive process. Accordingly, this is not a basis for dismissing Tedesco's ADA claims either.

*3. Tedesco's Retaliation Claim Survives*

Pearson makes two arguments as to Tedesco's ADA retaliation claim. First, Pearson argues that Tedesco insufficiently alleged that her engaging in protected activity caused the adverse employment action (her termination), because the temporal proximity between the two events was not sufficiently close.[103] It argues that, "[w]hile a four-month gap may be sufficient evidence of causation, a five-month gap is too long absent other evidence."[104] And it points to the gaps in time between Tedesco's various leaves of absence and her termination on August 5, 2020: 16 months from her first FMLA leave (April 7, 2019), and 10 months from her second (October 18, 2019).[105]

Tedesco responds that the adverse employment action was not only her final termination in August 2020, but also Pearson's termination of "her tenure as Evidence Field Champion, *a year earlier than agreed upon*,"[106] on January 18, 2020.[107] That narrows the gap to just a couple months—from October 2019, when Tedesco first took disability leave, to January 2020, when she lost her title.

Pearson does not address this point in its reply—either as to whether this qualified as an adverse employment action or whether its temporal proximity to her

---

[103] *Id.* at 22–23.
[104] *Id.* at 23 (*Aguillard v. La. College*, 824 F. App'x 248, 251 (5th Cir. 2020)).
[105] *Id.*
[106] R. Doc. No. 15, at 10 (citing R. Doc. No. 1, at 13 ¶ 95) (emphasis in original).
[107] *Id.*

taking leave is close enough to suggest causation. For purposes of retaliation claims, a materially adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Cabral v. Brennan*, 853 F.3d 763, 767 (5th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).[108]

Given the prestige of the Evidence Field Champion title—and, more importantly, the $5,000 bonus and advancement opportunities that it came with[109]—its being taken away from Tedesco plausibly could have dissuaded her from filing a charge of discrimination. Pearson's rescinding the title may therefore qualify as an adverse employment action. *Cf. Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283–84 (5th Cir. 2004) (holding that "the mere loss of subjective prestige" that came with a job transfer, without more, failed to qualify as an adverse employment action, but that where the new position had a "lower earning potential," a jury could find that the transfer was an adverse employment action). In short, the loss of such a title with such opportunities may not be a mere "non-actionable 'trivial' harm." *Davis v. Ft. Bend Cty.*, 765 F.3d 480, 490–91 (5th Cir. 2014) (quoting *Burlington*, 548 U.S. at 69).

---

[108] The Fifth Circuit also includes "demoti[ons]" among adverse employment actions. *McElroy v. PHM Corp.*, 622 F. App'x 388, 390 (5th Cir. 2015) (quoting *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014)).

[109] R. Doc. No. 1, at 10 ¶ 66 ("Evidence Field Champion is a Pearson Peer Leadership Role is a [sic] prestigious and highly competitive title reserved for high-achieving sales representatives, whom Pearson is training for leadership roles within the company. Pearson provides Evidence Field Champions with leadership training and those selected are considered on the path for promotion to upper-management roles."). Pearson itself recognizes that the program is "an award that honors top-performing salespersons with [a $5,000] bonus . . . and training." R. Doc. No. 20, at 9.

And that action plausibly was caused by Tedesco's requests for accommodation, which occurred a couple months before the action. As Pearson acknowledges, "a four-month gap may be sufficient evidence of causation." *Aguillard*, 824 F. App'x at 251. Accordingly, Tedesco has plausibly alleged that her being removed as Evidence Field Champion constituted retaliation under the ADA.[110]

Second, Pearson argues that, even if Tedesco can state a *prima facie* retaliation claim, Pearson had "legitimate, non-discriminatory reasons for its decision to terminate her employment"—namely, that Tedesco was on "indefinite leave."[111] But to claim that Tedesco's leave was indefinite contradicts her well-pleaded factual allegations that (1) her long-term disability leave was approved through only April 2022,[112] which is not indefinite, and (2) her treating physician reported, in July 2020, only that Tedesco was "disabled *at that time*."[113] And even if her leave was indefinite, this argument—that Pearson had non-discriminatory reasons for terminating Tedesco—goes to the *McDonnell Douglas* burden-shifting framework more properly analyzed on summary judgment. *See Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 317 (5th Cir. 2007) ("First [the plaintiff] must establish a prima facie case. Next, [the

---

[110] Moreover, even if Tedesco's final termination (rather than her loss of the Evidence Field Champion title) is the only relevant adverse employment action, Tedesco has plausibly alleged two independent protected activities for which her termination may have been retaliatory—both of which were closer temporally to her termination than were her requests for accommodation: (1) her taking long-term disability leave, which was approved on May 5, 2020 (three months before her termination), and (2) her EEOC charge of disability discrimination, which was filed on April 23, 2020. R. Doc. No. 1, at 14 ¶¶ 96, 98.

[111] R. Doc. No. 12-1, at 23–24.

[112] R. Doc. No. 1, at 14 ¶ 98.

[113] *Id.* at 15 ¶ 109 (emphasis added).

defendant] must put forth a legitimate, nondiscriminatory reason for the employment action. Finally, [the plaintiff] must prove that the proffered reason is pretextual.") (internal citations omitted).

Accordingly, the Court will not dismiss Tedesco's ADA retaliation claim.

### C. Tedesco's LEDL Claims are Analyzed Identically to her Federal Claims

Tedesco also brings state-law claims under the LEDL that are parallel to her ADA claims. *See* La. Rev. Stat. §§ 23:323(B)(1)–(2) (proscribing disability discrimination and failure-to-accommodate). Both Pearson[114] and Tedesco[115] agree that Louisiana courts apply the same legal analysis under the ADA to analogous provisions in the LEDL. *See Credeur v. Louisiana*, 860 F.3d 785, 791 n.3 (5th Cir. 2017); *Sutherland v. Edison Chouest Offshore, Inc.*, No. 19-414, 2020 WL 5436654, at *1 (E.D. La. Sept. 10, 2020) (Vance, J.) ("[T]he Court's analyses under the LEDL and the ADA are the same."). Accordingly, Tedesco's LEDL claims that are parallel to her ADA claims are not dismissed.

The same goes for Tedesco's LEDL claims that are parallel to her GINA claims. *See* La. Rev. Stat. §§ 23:368(B)(1) & (B)(3) (proscribing genetic information discrimination). Although the parties have not cited, and the Court has not found, any case holding as much, both Tedesco[116] and Pearson[117] agree that genetic-

[114] R. Doc. No. 12-1, at 24 n.5.
[115] R. Doc. No. 15, at 11.
[116] *Id.* at 7 ("For the same reasons as above, Defendant also violated" the LEDL's provisions governing genetic information.).
[117] R. Doc. No. 20, at 8 ("Plaintiff's LEDL claims fail on the same grounds as her GINA and ADA claims.").

information-based claims under the LEDL are analyzed identically to GINA claims. The Court therefore dismisses Tedesco's genetic-information-based LEDL claims for the same reasons it dismisses her GINA claims.

### D. Tedesco's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Fails

Tedesco's final cause of action alleges that "Pearson failed to engage in good faith and fair dealing in regard to Ms. Tedesco's employment contract by forcing her to take leave and stop working, and then terminating her while she was [sic] disability leave."[118] Pearson argues this claim must be dismissed because Tedesco "cannot show that anything other than Louisiana's default at-will status applied to her employment with Pearson,"[119] and "[t]he nature of at-will employment is such that the employer or the employee may end the employment relationship at any time for any reason not contrary to the law."[120]

Tedesco accepts that she was an at-will employee,[121] but she argues that even such "contracts must be performed in good faith."[122] And she acknowledges that this duty is violated when an employment contract is breached "with a dishonest or

---

[118] R. Doc. No. 1, at 23 ¶ 166.
[119] R. Doc. No. 20, at 9.
[120] *Id.* at 10 (citing *Clark v. Acco Sys., Inc.*, 899 So. 2d 783, 786 (La. Ct. App. 2d 2005)).
[121] R. Doc. No. 15, at 12 ("Absent a specific contract or agreement establishing a fixed term of employment, an 'at-will' employee is free to quit at any time without liability to his or her employer and, likewise, may be terminated by the employer at any time, provided the termination does not violate any statutory or constitutional provision." (citing *Clark*, 899 So. 2d at 783)).
[122] *Id.* (citing La. Civ. C. art. 1983).

morally questionable motive."[123] Alternatively, Tedesco appears to argue that her being named as Pearson's "Evidence Field Champion," and the early termination of that title, constituted a separate contract and separate breach.[124] To that, Pearson rejoins, "[a]t most, the program is an award that honors top-performing salespersons with bonus compensation and training"[125]—a description that comports with Tedesco's own account in the complaint.[126] Because the program is merely an award, Pearson argues, "[i]t is not a contract that alters the participating employee's at-will status."[127] And although that at-will status "may be altered by contract," it is not altered by an employer's "internal policies, procedures, and manuals," as was the case here.[128]

Pearson is correct, for two reasons. First, Tedesco's at-will employment status—again, a premise that Tedesco does not challenge—meant that she could be fired by Pearson without cause. "If the employment contract is an at-will agreement, an employee's termination need not be accurate, fair, or reasonable, and there does not have to be any reason at all for termination." *Filson v. Tulane Univ.*, No. 09-7451,

---

[123] *Id.* (quoting *Barbe v. A.A. Harmon & Co.*, 705 So. 2d 1210, 1220 (La. Ct. App. 4th Cir. 1998)).
[124] *Id.* at 13.
[125] R. Doc. No. 20, at 9.
[126] R. Doc. No. 1, at 10 ¶ 66 ("Evidence Field Champion is a Pearson Peer Leadership Role is a [sic] prestigious and highly competitive title reserved for high-achieving sales representatives, whom Pearson is training for leadership roles within the company. Pearson provides Evidence Field Champions with leadership training and those selected are considered on the path for promotion to upper-management roles.").
[127] R. Doc. No. 20, at 9–10.
[128] *Id.* at 10 (quoting *Mix v. Univ. of New Orleans*, 609 So. 2d 958, 963 (La. Ct. App. 4th Cir. 1992)) (internal quotations omitted).

2010 WL 5477189, at *3 (E.D. La. Dec. 29, 2010) (Engelhardt, J.) (citing *Clark*, 899 So. 2d 783). And "[t]he duty to perform the at-will compensation agreement in good faith cannot be used to significantly alter the contract by requiring more than the terms of the agreement." *Nicholas v. Allstate Ins. Co.*, 739 So. 2d 830, 837 (La. Ct. App. 2d Cir. 1999), *rev'd on other grounds*, 765 So. 2d 1017 (La. 2000) (citing *Frichter v. National Life & Accident Ins. Co.,* 620 F. Supp. 922 (E.D. La. 1985) (Collins, J.), *summarily affirmed,* 790 F.2d 891 (5th Cir. 1986)). Accordingly, Pearson could fire Tedesco for any reason, good or bad, and not breach the at-will employment contract.

Moreover, "[a] breach of the duty of good faith and fair dealing requires a breach of contract." *Schaumburg v. State Farm Mut. Auto. Ins.*, 421 F. App'x 434, 439 (5th Cir. 2011); *see also id.* ("Bad faith is not the mere breach of faith in not complying with a contract, but a *designed breach of it* from some motive of interest or ill will." (quoting *Fertel v. Brooks*, 832 So. 2d 297, 306 n.12 (La. Ct. App. 4th Cir. 2002) (emphasis added, internal quotations omitted))). Absent a breach of contract, there is no independent claim for acting in bad faith. Accordingly, where an employment contract allows for at-will termination, and termination for no (or even an impermissible) cause does not constitute breach, there is no claim for breach of the implied covenant of good faith. *Id.* at 438–39 (finding no breach of an at-will agency agreement, which precluded a claim for breach of good faith).

Because Tedesco accepts that this was an at-will employment agreement, she cannot state a claim for breach of that agreement—it may be terminated for any cause

without rendering such termination a breach. And since there can be no contractual breach, she cannot state a claim for breach of the implied covenant of good faith.[129]

Second, Tedesco's being named as "Evidence Field Champion" does not change the analysis. "Louisiana recognizes a presumption favoring at will employment." *Stanton v. Tulane Univ. of La.*, 777 So. 2d 1242, 1250 (La. Ct. App. 4th Cir. 2001). And Louisiana courts have consistently held that "employee manuals as well as company policies and procedures do not confer contractual rights upon employees nor create any exceptions to the 'employment at will' doctrine." *Id.*; *see also id.* at 1250–51 (citing, *inter alia*, *Mix*, 609 So. 2d at 963, and holding that an employee handbook did not constitute an independent employment contract); *Aldahir v. Mobil Exploration & Producing Southeast, Inc.*, 420 So. 2d 714, 715 (La. Ct. App. 4th Cir. 1982) (concluding that a job performance notice sent to the employee from the employer, which delineated certain goals that were to be achieved by a fixed date, did not constitute a promise of employment through that date).

Tedesco alleges only that the Evidence Field Champion role "was renewed for another 18 months beginning in August 2019 and ending January 2021," was reserved for "high-achieving sales representatives," and entitled her to a stipend and additional professional development opportunities.[130] Crucially, she does *not* allege that such Champions were entitled to additional protections against termination—

---

[129] Even if Tedesco could state a breach of contract claim, she fails to sufficiently allege the facts from which it could be reasonably inferred that Pearson acted with the requisite "dishonest or morally questionable motive." *See Barbe*, 705 So. 2d at 1220.

[130] R. Doc. No. 1, at 10 ¶¶ 64–66.

*e.g.*, that they may be terminated only for cause or that their employment is *guaranteed* for a fixed term. Accordingly, she has failed to plead sufficient facts to rebut Louisiana's presumption favoring at-will employment. At most, the role is a highly competitive title that comes with a fast-track to upper-management. That does not render it a contract. It is more akin to a company's internal policies governing and incentivizing advancement, which, for the reasons stated above, does not constitute an independent employment contract. *See Aldahir*, 420 So. 2d at 715. Absent an independent employment contract, the at-will standard described above applies and precludes her claim.

Nor does Tedesco, assuming *arguendo* that Pearson violated the ADA, have an *independent* claim for breach of the implied covenant of good faith and fair dealing by virtue of the ADA violation. *See, e.g.*, *Brouillette v. Transamerican Ref. Corp.*, No. 95-0584, 1995 WL 683869, at *5 (E.D. La. Nov. 11, 1995) (McNamara, J.) ("Terminating an employee in violation of a statute . . . does not give rise to a breach of contract claim or a breach of implied covenant of good faith and fair dealing in the employment at-will context; rather, termination in violation of a statute is actionable only under the dictates of the statute."); *Pate v. Pontchartrain Partners, LLC*, No. 13-6366, 2014 WL 5810521, at *3 (E.D. La. Nov. 7, 2014) (Wilkinson, M.J.) (dismissing breach of good faith and fair dealing claim but not dismissing Title VII pregnancy discrimination claim); *Ivory v. M.L. Smith, Jr. L.L.C.*, No. 15-2022, 2015 WL 9074730, at *4 (W.D. La. Oct. 14, 2015) ("[W]hile those allegations [of racial animus and ill will] support [the plaintiff's] claims for relief under state and federal discrimination laws,

he does not allege a viable claim for breach of any contractual obligation."), *report and recommendation adopted*, 2015 WL 9009050 (Dec. 15, 2015).[131] Consequently, this claim must be dismissed.

**V.**

Accordingly,

**IT IS ORDERED** that Pearson's motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** insofar as the claims raised in Tedesco's first and fifth causes of action—her claims under GINA and her claim for breach of the implied covenant of good faith and fair dealing—are **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion is **GRANTED** insofar as Tedesco's fourth cause of action is **DISMISSED WITHOUT PREJUDICE IN PART**. It is dismissed as to the state-law, genetic-information-based claims raised therein, for the same reasons that her first cause of action was dismissed. The fourth cause of action is not dismissed in all remaining respects.

---

[131] To be sure, the Louisiana Supreme Court has stated that an employer's right to terminate an at-will employee without reason is "tempered by numerous federal and state laws which proscribe certain reasons for dismissal of an at-will employee." *Quebedeaux v. Dow Chem. Co.*, 820 So. 2d 542, 545–46 (La. 2002). This Court does not read that, however, to provide a separate cause of action for breach of contract or the duty of good faith and fair dealing whenever a statutory violation occurs. *See Sanchez v. Georgia Gulf Corp.*, 869 So. 2d 277, 282–83 (La. Ct. App. 1st Cir. 2003) (concluding that Louisiana's drug-testing statute, which provides certain rules and procedures to follow when conducting drug tests in the workplace, "does not provide for an exception to the employment at-will doctrine").

**IT IS FURTHER ORDERED** that the motion is **DENIED** as it relates to Tedesco's second, third, and (in part) fourth causes of action; her ADA disability-discrimination and retaliation claims, as well as any parallel state-law claims, are not dismissed.

New Orleans, Louisiana, June 4, 2021.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**