UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TIFFANIE TEDESCO,** | ) | NO.: 2:21-CV-199 |
| | ) | |
| Plaintiff, | ) | SECTION: "I" |
| | ) | |
| VS. | ) | JUDGE: LANCE M. AFRICK |
| | ) | |
| **PEARSON EDUCATION, INC., and** | ) | MAGISTRATE: DONNA PHILLIPS |
| **XYZ INSURANCE COMPANIES** | ) | CURRAULT |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S SEPARATE AND CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Pearson Education, Inc. ("Pearson"), through its counsel, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, respectfully submits this separate and concise statement of material facts in support of its contemporaneously-filed Motion for Summary Judgment that Pearson contends present no genuine issue:[1]

1. Pearson is a global learning company with over 20,000 employees providing services, including high quality, digital content and learning experiences, assessments and qualifications, in nearly 200 countries. (Exh. B, Rippolone ¶ 4.)

2. Through its Higher Education line of business, Pearson creates personalized, digital learning experiences for higher education and college students. (*Id*. at ¶ 5.)

---

[1] Citations to Tedesco's deposition will be referenced as "Exh. A, Tedesco" and the cited page(s), *e.g.*, Tedesco 1:1-2:2. Citations to exhibits to Tedesco's deposition which are the subject of cited testimony will be referenced as "Dep. Exh. __." Exhibits will be referenced by the exhibit number, *e.g.*, Exh. 3. The Declaration of Kelly Rippolone will be referenced as "Exh. B, Rippolone" and the paragraph number, *e.g.*, Rippolone ¶ 1. Exhibits to Rippolone's Declaration will be referenced as "Decl. Exh. __." The Declaration of Ty Olden will be referenced as "Exh. C, Olden" and the paragraph number, *e.g.*, Olden ¶ 1. Exhibits to Olden's Declaration will be referenced as "Decl. Exh. __." The Declaration of Susan Desmond will be referenced as "Exh. D, Desmond" and the paragraph number, *e.g.*, Desmond ¶ 1. Exhibits to Desmond's Declaration will be referenced as "Decl. Exh. __." The Declaration of Bill Schoof will be referenced as "Exh. E, Schoof" and the paragraph number, *e.g.*, Schoof ¶ 1. Exhibits to Schoof's Declaration will be referenced as "Decl. Exh. __."

3. Within Pearson North America's Higher Education Sales division, Sales Representatives work in geographic regions to sell "effective and innovative digital, print and service solutions" to the faculty of local colleges and universities, visiting with them on-campus and virtually. (Exh. A, Tedesco Dep. Exh. 16 at PEARSON000017.)

4. Pearson is committed to providing its employees with a workplace free from unlawful discrimination, harassment and retaliation. Pearson maintains an Equal Employment Opportunity Compliance and Harassment Policy ("EEO Policy"), which provides, in part:

> We are committed to creating and fostering a work environment free from unlawful discrimination and harassment and one in which decisions and terms of employment are not based in any way on disability . . . or other category protected by law. . . . We are also committed to providing an accessible work place for all employees. Pearson-US will make reasonable accommodations on behalf of individuals with disabilities of which we are aware.

(Exh. B, Rippolone ¶ 6, Decl. Exh. 1.)

5. Employees in need of accommodations were provided with phone number of the Corporate Employee Relations department, as one option (in addition to speaking with a supervisor, another supervisor or any HR employee) for requesting accommodations. (Exh. B, Rippolone Decl. Exh. 1 at PEARSON000001.)

6. The EEO Policy also provided information to employees on how to report workplace discrimination concerns to Pearson. The complaint procedure noted that an employee should immediately inform their supervisor. (*Id.* at PEARSON000003.)

7. If it would be inappropriate or uncomfortable to discuss the matter with a supervisor, the employee was directed to contact their Human Resources Representative, the Vice President of Human Resources within their division or the Corporate Employee Relations department. (*Id.* at PEARSON000001.)

8. An alternative would be to submit a complaint online through the Pearson Code of Conduct process, and the link was provided. (*Id*. at PEARSON000001.)

9. Tedesco executed onboarding paperwork related to Pearson's policies in March 2014 after she commenced work with Pearson. (Exh. A, Tedesco Dep. Exh. 15.)

10. In that paperwork, Tedesco acknowledged that she received Pearson's policies, that she read instructions on how to access the most current policies and that she had access to them via Pearson's intranet, an online portal accessible to employees. (*Id*.)

11. Tedesco began her employment with Pearson on March 11, 2014, as a Sales Representative in Pearson's Higher Education Sales division. (Exh. A, Tedesco 25:13-18, 28:7-25.)

12. Pearson's offer letter, which Tedesco countersigned on her first day, indicates that her work location was the New Orleans, LA territory. (Exh. B, Rippolone ¶ 8, Decl. Exh. 2 at PEARSON000013.)

13. The offer letter also reflected that Tedesco would report to District Sales Manager, Julie Morel. (*Id*.)

14. By countersigning the letter, Tedesco acknowledged that her employment with Pearson was "at will" and that either Tedesco or Pearson could "end [Tedesco's] employment and compensation at any time, with or without cause, and with or without notice." (Exh. B, Rippolone Decl. Exh. 2 at PEARSON000015.)

15. Tedesco reported to Morel from the time of her hire until a company reorganization in June 2018, at which point Tedesco began reporting to District Sales Manager Ty Olden in July 2018. (Exh. A, Tedesco 26:8-22, 27:20-25, 29:1-8; Exh. C, Olden ¶ 9.)

16. Olden reported to Vice President of Sales Jeanne Bronson, and Bronson reported to Robin Baliszewksi, Managing Director of Higher Education Sales. (Exh. C, Olden ¶ 7.)

17. Tedesco was an extremely successful salesperson and was highly regarded by Pearson for her excellent performance. (*Id*. at ¶ 10.)

18. Tedesco describes herself as a "rock star" and "the golden child." (Exh. A, Tedesco 96:5, 114:14.)

19. Tragically, Tedesco's father died by suicide on Monday, December 31, 2018. (Exh. A, Tedesco 31:4-10.)

20. Tedesco worked between learning of her father's death and his funeral on January 9, 2019, only taking time off for the funeral. (Exh. A, Tedesco 34:10-25, 39:12-15.)

21. Shortly after, Pearson employees were scheduled to take certification tests on January 11. Tedesco took issue with the timing of the test in light of her father's recent suicide. On January 8, however, Tedesco and nine other Pearson employees received an email from Lara Davis, Digital Sales Specialist, indicating that the employees should not " put too much pressure on [themselves] when preparing for these certifications" and noted that the certifications were "low stakes." (Exh. A, Tedesco Dep. Exh. 1.)

22. Tedesco did not explain the circumstances of her father's death to Olden until mid-January, and he told Tedesco that she could take two weeks off if needed and he would get a temporary work to fill in for her. (Exh. A, Tedesco 36:4-21.)

23. But Tedesco did not ask for time off. (Exh. A, Tedesco 41:12-15.)

24. In the immediate aftermath of her father's death, Tedesco's family suggested that she seek out therapy. (Exh. A, Tedesco 269:24-270:2.)

25. Tedesco also called Pearson's Employee Assistance Program ("EAP") in early January to inquire after counseling. (Exh. A, Tedesco 14:11-16.)

26. She was already seeing a psychiatrist, Dr. Teri Schwarz, and had been since September 23, 2016. (Exh. A, Tedesco 12:9-22; Exh. D, Desmond Decl. Exh. 13 at SCHWARZ000053).

27. Dr. Schwarz diagnosed Tedesco with Major Depressive Disorder ("MDD"), Generalized Anxiety Disorder ("GAD"), panic disorder, and Obsessive Compulsive Disorder ("OCD"). (Exh. D, Desmond Decl. Exh. 13 at SCHWARZ000053.)

28. She added "grief" to the list of Tedesco's diagnoses on January 11, 2019. (*Id*. at SCHWARZ000044.)

29. Notably, her psychiatrist did not diagnose Tedesco with post-traumatic stress disorder (PTSD) at this time.

30. Tedesco attended a dinner with Bronson on Wednesday, April 3 and conducted on-campus visits in New Orleans with her the next day (the "April Client Meetings").

31. Tedesco testified that from the time of her father's death to the April Client Meetings, no one at Pearson questioned her competency or ability to do her job and did not remove her from a leadership or management track. (Exh. A, Tedesco 42:23-43:10.)

32. During dinner on April 3, Bronson told Tedesco, and Samantha McKay, a Sales Representative, to polish up their résumés. (Exh. A, Tedesco 61:10-11, 62:10-21, 63:19-21.)

33. Tedesco testified that after the dinner, she was worried about losing her job and could not sleep that night. (Exh. A, Tedesco 64:24-65:1, 21-24.)

34. Tedesco interpreted Bronson's comments regarding résumé updates to be "a threat" and an implication that she "was going to be laid off because another reorg was coming soon and

there would be a lot of layoffs in sales again like last year." (Exh. A, Tedesco Dep. Exh. 13 at TEDESCO425.)

35. But she admitted that she had "no idea" whether Bronson intended to "trigger anything" with her advice regarding resume updates, and the comment was not directed specifically to Tedesco. (Exh. A, Tedesco 66:2-4.)

36. On April 4, as Bronson and Tedesco were leaving after a scheduled breakfast meeting with a customer, Tedesco said to Bronson, "I know I'm acting," and Bronson allegedly filled in with "Manic? You need to get some help. I've never dealt with suicide before." (Exh. A, Tedesco 70:24-71:3.)

37. Tedesco testified that Bronson made the "manic" comment on this one occasion and that it did not happen again. (Exh. A, Tedesco 276:14-17.)

38. At the end of the day, Tedesco texted Bronson, "[t]hank you Jeanne for today! It was great to see you and thank you for sharing this article about opioids. I already shared it with my mom." (Exh. A, Tedesco Dep. Exh. 3.)

39. Tedesco has not spoken to Bronson since April 4, 2019. (Exh. A, Tedesco 276:22-25.)

40. On Sunday, April 7, Tedesco emailed Olden to let him know that she was taking FMLA leave effective immediately. (Exh. C, Olden ¶ 12, Decl. Exh. 22.)

41. Olden emailed her back, supportively. (Exh. A, Tedesco 163:20-25.)

42. He also called Tedesco, and after Tedesco described her interactions with Bronson he said, "[t]hat doesn't sound like her" and suggested that Tedesco call Baliszewski. (Exh. A, Tedesco 164:1-3.)

43. Tedesco did not consult with any health care professional before taking FMLA leave but knew that she "needed to take care of [her]self first and foremost." (Exh. A, Tedesco 163:10-15, 17-19.)

44. That same evening, Tedesco spoke with Baliszewski, and Baliszewski encouraged her to share the details of the April Client Meetings with Kelly Rippolone, Vice President of Human Resources. (Exh. A, Tedesco 81:13-15, 83:12-14.)

45. Tedesco first spoke with Rippolone on Monday, April 8. (Exh. A, Tedesco 84:22-23; Exh. B, Rippolone ¶ 9.)

46. Rippolone wrote in her notes that Tedesco asked if Rippolone knew when and how her father passed away. (Exh. B, Rippolone Decl. Exh. 3 at PEARSON000097.)

47. Rippolone responded that she did not, and Tedesco told Rippolone that her father committed suicide. (Exh. A, Tedesco 85:14-15; Rippolone Decl. Exh. 3 at PEARSON000097.)

48. Tedesco noted that she explained the cause of her father's death to Morel and Olden in January 2019 and Baliszewski in March 2019. (Exh. B, Rippolone Decl. Exh. 3 at PEARSON000097.)

49. Rippolone spoke with Tedesco for about an hour and a half and Tedesco's tone "was very agitated, switching from being very charming to being in despair." (*Id.*)

50. Rippolone found it "difficult to understand [Tedesco] as she appeared to be all over the place" and "often didn't quite finish the story." (*Id.*)

51. Tedesco told Rippolone that "she was considering filing for FMLA as she was still suffering from her father's death." (*Id.*)

52. Tedesco and Rippolone next spoke over email on April 10. Tedesco thanked Rippolone for their conversation on April 8 and said, " I have heard wonderful things about you

from my co-workers and I am delighted to be speaking with you." (Exh. A, Tedesco Dep. Exh. 4 at TEDESCO457.)

53. Tedesco's ultimate question to Rippolone was whether Pearson had a formal grievance policy. (*Id*.)

54. Tedesco included a link to the Convercent website, a third-party reporting platform that Pearson uses to manage Code of Conduct complaints. (Exh. A, Tedesco 241:24-242:1.)

55. Rippolone responded the same day and said, "[y]es, you can use that site if you're more comfortable with that process." (Exh. A, Tedesco Dep. Exh. 4 at TEDESCO457.)

56. In a separate email on April 10, Rippolone reiterated that she was Tedesco's point of contact in HR to file a complaint but that she could point Tedesco to another person if she preferred. (*Id*. at TEDESCO456.)

57. Although Rippolone said that Tedesco could use the Convercent site, she did not do so at that time. (Exh. A, Tedesco 92:3-8, 93:1-8.)

58. Tedesco did not contact Rippolone again about the April Client Meetings until September 2019. (Exh. A, Tedesco 92:18-21.)

59. Dr. Schwarz did not diagnose Tedesco with PTSD until April 10. (Exh. D, Desmond Decl Exh. 13 at SCHWARZ000041, 44, 53.)

60. PTSD does not appear again as a listed diagnosis in Dr. Schwarz's notes until October 29. (*Id*. at SCHWARZ000033.)

61. Tedesco testified that she "only saw a doctor one time up until Dr. Klenck" and that "[m]aybe I saw the same doctor twice, but it wasn't enough time to diagnose [me]." (Exh. A, Tedesco 268:15-17.)

62. But Tedesco had seen Dr. Schwarz almost monthly since September 2016. (Exh. D, Desmond Decl Exh. 13 at SCHWARZ000053.)

63. In the initial questionnaire from Tedesco's first meeting with Dr. Klenck on April 11, Tedesco noted that her problems began on January 1 and got worse over Mardi Gras. (Exh. D, Desmond Decl Exh. 14 at KLENCK000004-10.)

64. On April 22, Dr. Klenck wrote that Tedesco was anxious and depressed, still processing her father's death, feeling alone and dealing with strained relationships with her mother and brother. (*Id*. at KLENCK000011.)

65. PTSD does not appear in Dr. Klenck's notes until May 15 after Dr. Klenck administered psychiatric assessments to Tedesco and noted that the ratings were severe for depression, PTSD and anxiety. (*Id*. at KLENCK000021.)

66. Dr. Klenck first diagnosed Tedesco with MDD and passive suicidal ideation in December. (Exh. A, Tedesco 301:17-23.)

67. Tedesco testified that it was not until October 14 that Pearson knew she had PTSD. (Exh. A, Tedesco 282:12-20.)

68. She also testified that Olden was aware as of spring 2019 that she was seeking therapy to cope with her father's death but could not recall if he knew about her PTSD diagnosis. (Exh. A, Tedesco 286:2-8, 288:2-11.)

69. Tedesco could not identify anyone at Pearson that knew she had PTSD prior to October 14. (Exh. A, Tedesco 286:9-15.)

70. Tedesco further testified that she did not tell anyone at Pearson about her MDD or that she had suicidal ideation. (Exh. A, Tedesco 302:5-12.)

71. Tedesco's FMLA leave began on April 7, and Tedesco returned from leave on July 15, after Pearson's recent reorganization. (Exh. A, Tedesco 95:16-18.)

72. Tedesco testified that when she returned to work in July 2019, she was treated like she was "incompetent" and could not perform her job. (Exh. A, Tedesco 95:22-24.)

73. But she also testified that it was not until September 14 that she informed Pearson of her concerns. (Exh. A, Tedesco 96:4-10.)

74. The only time that Tedesco felt her competency was being questioned was on September 13 when Olden emailed her and noted, among other things, that he did not want her to burn out by working until midnight every night and all weekend and closed his email with, "Have a great weekend. Put the computer down and go sit in your garden!" (Exh. A, Tedesco Dep. Exh. 7.)

75. Tedesco testified that this bothered her because it was a memorial garden for her father. (Exh. A, Tedesco 103:11-14.)

76. The email from Olden also upset her because no one had questioned her before and "it was a personal attack at me after my father – after Jeanne comes into town, says I'm acting manic." (Exh. A, Tedesco 108:5-7.)

77. But Olden commented that Tedesco should sit in her garden because he knew that she had taken up gardening and was energetic about it. (Exh. C, Olden ¶ 17.)

78. On September 14, Tedesco filed a formal grievance through Convercent. (Exh. A, Tedesco Dep. Exh. 13.)

79. It largely focused on the April Client Meetings, and Tedesco's issues with Bronson referring to her behavior as "manic." (*Id.*)

80. Tedesco characterized these interactions as "beyond the reasonable bounds of human decency." (*Id*. at TEDESCO424)

81. In response to Tedesco's September 14 grievance, Roger Grunwald, Director of Employee Relations, emailed Tedesco on September 16 and again on September 18 when Tedesco did not reply. (Exh. A, Tedesco Dep. Exh. 5.)

82. He explained that her Convercent report was assigned to him and that he would be conducting a confidential investigation. (*Id*.)

83. At first, Tedesco was hesitant to have Grunwald speak with anyone else during his investigation, but he explained that was the only way that he could help her. (Exh. A, Tedesco 241:7-9.)

84. Tedesco emailed Grunwald at 11:46 PM on Friday, September 27 with the subject line "I need to talk to someone ASAP." (Exh. A, Tedesco Dep. Exh. 6.)

85. The email did not specify that Tedesco only wanted to speak with Grunwald. (*Id*.)

86. Grunwald spoke with Tedesco briefly the next day, Saturday, September 28, but he had guests in town and could not speak for long. (Exh. B, Rippolone ¶ 10, Decl. Exh. 3 at PEARSON000098.)

87. Grunwald contacted Rippolone about Tedesco's concerns, and she volunteered to call Tedesco that morning. (*Id*.)

88. During the call, Tedesco complained about a co-worker, Kim Bishop, and cried while saying that she had "lost all hope" and was "angry at corporate America." (*Id*.)

89. She also said, "maybe I should find a new job. I wish I had a fabulous job like Jeanne's new one with the PCAs." (*Id*.)

90. Tedesco told Rippolone that she felt "lost, that there's no option for her but to quit." (*Id.*)

91. Tedesco felt that her workload was too heavy, and she thought that "other employees ha[d] been gossiping about her." (*Id.*)

92. Rippolone wrote that "[a]s for switching out her managers to someone else besides Ty, I'd have to discuss it with Robin." (*Id.*)

93. Tedesco claimed that Rippolone then asked her if she was suicidal and told her "to take vacation if I didn't want to take leave." (Exh. A, Tedesco 110:13-15.)

94. Tedesco emailed Grunwald again on September 28, asking to speak with him as soon as possible and alleging that her co-worker, Bishop, screamed at her in front of other Pearson employees who were in town for a conference. (Exh. A, Tedesco Dep. Exh. 14 at TEDESCO432.)

95. When asked to identify Bishop's hostile behavior, Tedesco testified that it included the dinner and a text message regarding a client's institutional agreement. (Exh. A, Tedesco 258:9-14. 261:1-20.)

96. Tedesco stated that these interactions with Bishop "triggered" her. (Exh. A, Tedesco 265:15-19.)

97. Specifically, Tedesco said that it "triggered the event that happened with Jeanne," "every event that happened up until then" and "all the hostility that I continue to feel from different people." (Exh. A, Tedesco 265:15-19.)

98. When asked if Tedesco had any knowledge of what Bishop knew about her medical condition, Tedesco responded, "I don't." (Exh. A, Tedesco 266:20-22.)

99. When asked whether Bishop knew that Tedesco had PTSD, Tedesco responded, "I have no idea." (Exh. A, Tedesco 266:9-12.)

100. Tedesco emailed Grunwald again on Monday, September 30, and stated that she met with her therapist who "agreed I should take as much time off from Pearson due to" Bronson's alleged statement "on April 4th, calling me 'manic' and labelling me." (Exh. B, Rippolone ¶ 13, Decl. Exh. 4.)

101. The next day, Tedesco sent another email to Grunwald where she stated, "to be clear I am not manic, bipolar, etc. *I do not have any mental illnesses*." (Exh. A, Tedesco Dep. Exh. 9 at TEDESCO494) (emphasis added).

102. Tedesco requested to speak only with Grunwald going forward and noted that she did not want to speak with anyone else, including Rippolone and Baliszewski. (Exh. A, Tedesco Dep. Exh 9 at TEDESCO 489.)

103. It should be noted that Rippolone was her point of contact for the interactive process – not Grunwald who had no responsibility regarding ADA accommodations.

104. Yet, just a few hours later, Tedesco emailed Rippolone and Baliszewski, thanking them for their support. (Exh. A, Tedesco Dep. Exh. 10.)

105. It should be noted that Rippolone was her point of contact for the interactive process – not Grunwald who had no responsibility regarding ADA accommodations.

106. Tedesco's last day worked was September 27, 2019, and Tedesco testified that she was no longer capable of working as of October 1. (Exh. A, Tedesco 279:8-10.)

107. She filed for short term disability ("STD") on October 15, and her claim was granted by Pearson's STD provider, Lincoln Financial Group. (Exh. A, Tedesco Dep. Exh. 12.)

108. In a letter signed by Dr. Klenck on October 31, she noted that Tedesco was experiencing symptoms of PTSD and that despite her attempts to return to work "she has continued

to suffer significant distress that interferes with her ability to fully engage in normal activities associated with the requirements of her job." (Exh. A, Tedesco Dep. Exh. 11.)

109.    It was also Dr. Klenck's opinion and recommendation that Tedesco be provided time away from work that could last up to or more than 6 months (*i.e.*, April 2020), at which point she could be reevaluated for her ability to return to work. (*Id*.)

110.    On July 17, 2018, Tedesco, and a larger group of employees, received an email announcing the 2018-2019 Evidence Based Field Champion ("EBFC") group. (Exh. E, Schoof ¶ 7, Decl. Exh. 10.)

111.    Evidence Based Field Champions are employees within the Higher Education Sales divisions who are in the field and who have been successful in using data and analytics to demonstrate why Pearson's products are better than those of Pearson's competitors. (*Id*. at ¶ 5.)

112.    Tedesco was listed as one of the two EBFCs for the Southwest Region. (*Id*. at ¶ 8, Decl. Exh. 10.)

113.    Schoof stated in a July 1, 2019 email that Tedesco would "*continue* as one of our Evidence Field Champions," meaning that she would continue in that role for another six months to fulfill the full 18-month tenure. (*Id*. at ¶ 9-10, Decl. Exh. 11)(emphasis added).

114.    In accordance with the time-frame of the program, Schoof sent out an email on January 18, 2020, thanking Tedesco for her tenure, which, he noted, ended on December 13, 2019. (*Id*. at ¶ 13-14, Decl. Exh. 12.)

115.    A new EBFC began her tenure on January 1, 2020. (*Id*. at ¶ 14, Decl. Exh. 12.)

116.    Tedesco's tenure as EBFC was not prematurely ended, as she served a full 18 months in that role.

117. On April 23, 2020, Tedesco filed her first EEOC charge, alleging retaliation, harassment, and discrimination on the basis of her disability and her genetic information. (Dkt. 9-2 at ¶ 96.)

118. Tedesco filed a second EEOC charge on August 28, alleging violations of the ADA and GINA. (*Id*. at ¶ 118.)

119. Tedesco indicated that she had been terminated because the company could not hold her position open. (*Id*.)

120. The EEOC did not complete an investigation of either Charge and on November 3, 2020, at Tedesco's request, the EEOC issued a Notice of Right to Sue for each Charge. (*Id*. at ¶ 120.)

121. Tedesco testified that her "rebuttal" to Pearson's EEOC position statement was due on August 6 but admitted that she did now know what Pearson knew about the rebuttal deadline. (Exh. A, Tedesco 320:1-321:18.)

122. On May 5, 2020, after Tedesco had been on STD for six months, Tedesco went through the approval process for and was placed on long term disability ("LTD") per Pearson's disability policy. (Exh. A, Tedesco Dep. Exh. 12.)

123. Two months later, after Tedesco had been out on her second period of leave for over nine months, Rippolone contacted Tedesco on July 22 to check her status, noting that Tedesco "ha[s] not returned to work in any capacity since October 15, 2019," and may have a condition covered by the ADA. (*Id*.)

124. Pearson asked Tedesco to contact Pearson to discuss whether she was able, at that time, "to perform the essential functions of work currently available through the Company that [she was] qualified to perform." (*Id*.)

125. The letter also offered for Tedesco to speak to another HR representative if Tedesco was uncomfortable with Rippolone. (*Id.*)

126. Tedesco responded to Rippolone's email on July 30 and indicated that ***her estimated return to work date was, at earliest, April 28, 2022***. (Exh. B, Rippolone ¶ 15, Decl. Exh. 6) (emphasis added).

127. On July 31, Dr. Klenck sent correspondence to Pearson stating, "Ms. Tedesco does not have a return to work date at this time" and advising "that ***it is important that you not contact my client in the future for any reason***, taking into account her mental health and disability status." (Exh. B, Rippolone ¶ 16, Decl. Exh. 7) (emphasis added).

128. On August 5, 2020 Pearson's outside counsel notified Tedesco's attorneys via email that Tedesco's position had been replaced due to her inability to return to work for the foreseeable future. (Exh. D, Desmond ¶ 4, Exh. 15.)

129. The email also attached a letter including information regarding Tedesco's benefits and noted that "[f]or purposes of receiving continued LTD and benefits," Tedesco would "be considered inactive in [Pearson's systems]." (Exh. A, Tedesco Dep. Exh. 2 at TEDESCO415.)

130. Tedesco testified that Empower Retirement first told her that she would not have access to her 401(k) while she continued to receive LTD benefits. (Exh. A, Tedesco 60:4-6.)

131. Tedesco remained "inactive" in Pearson's systems and was not officially listed as "terminated" in Pearson's systems until May 1, 2021, so that she could continue to receive LTD benefits. (Exh. B, Rippolone ¶ 17.)

132. At Lincoln Financial Group's request, Dr. Michael Chaftez performed an independent medical evaluation ("IME") of Tedesco on February 24, 2021, to assess Tedesco's

request for an extension of her LTD benefits. (Exh. D, Desmond Decl. Exh. 16 at TEDESCO1025 - TEDESCO1036.)

133. Dr. Chaftez noted that when he brought out the tests to be administered, one of which had a Pearson logo, Tedesco began shouting, ranting, banging on the table and stomping her feet on the ground to the point that her chair lifted up. (Exh. D, Desmond Decl. Exh. 16 at TEDESCO1033 - TEDESCO1034.)

134. Tedesco confirmed that she burst into a rant when she saw the Pearson logo on one of the tests because she used to sell that test. (Exh. A, Tedesco 232:7-13.)

135. Tedesco testified that she agreed with the assessment from the IME that any little stressor can set her off but noted that was not true from April to July 2019. (Exh. A, Tedesco 233:4-13, 235:8-13.)

136. She also agreed that, as of her deposition on August 3, 2021, she should be restricted from working in any setting due to her "easily triggered emotionality" and because her emotional dysregulation would be disruptive in the workplace. (Exh. A, Tedesco 233:14-22, 235:14-18.)

137. Tedesco was a top-performing Sales Representative who brought in millions of dollars of sales for Pearson in its Higher Education line of business, and Pearson only stood to continue losing substantial business in Louisiana with Tedesco on an extended, undefined period of leave. (Exh. C, Olden ¶ 18.)

138. Her position could not be covered long-term by a temporary worker. (*Id*. at ¶ 20.)

139. The replacement of her position was a business necessity, and Pearson's attempt to hold the position open as long as possible is evidenced by the fact that Pearson did not list Tedesco's position until August 2020 and her replacement was not hired until December 2020. (*Id*. at ¶ 23.)

Dated: August 31, 2021            **JACKSON LEWIS P.C.**

*s/ Rachel T. Gulotta*
SUSAN FAHEY DESMOND (T.A.)
(La. Bar Roll No. 25380)
E-mail: Susan.Desmond@jacksonlewis.com
RACHEL T. GULOTTA
(La. Bar Roll No. 37706)
E-mail: Rachel.Gulotta@jacksonlewis.com
KATELYN W. HARRELL
(La. Bar Roll No. 35164)
E-mail: Katelyn.Harrell@jacksonlewis.com
650 Poydras Street, Suite 1900
New Orleans, Louisiana 70130
Telephone: (504) 208-1755
Facsimile: (504) 208-1759

**COUNSEL FOR DEFENDANT,**
**Pearson Education, Inc.**

## CERTIFICATE OF SERVICE

A copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system that served notice on all users registered for electronic notice.

*s/ Rachel T. Gulotta*
RACHEL T. GULOTTA